DECISION
{¶ 1} Relator, The Shelly Company, filed this original action requesting a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate *Page 2 
its award to respondent Christine Steigerwald for relator's violation of a specific safety requirement ("VSSR").
 {¶ 2} This matter was referred to a magistrate of this court pursuant to Civ.R. 53(D) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate examined the evidence and issued a decision (attached as Appendix A), including findings of fact and conclusions of law. Therein, the magistrate concluded that the post-accident inspections provided the commission with some evidence to support its determination that the reverse signal alarm was not working at the time of the accident, and that the commission did not abuse its discretion in refusing to grant a rehearing based upon relator's claim of immunity for a first-time failure of the reverse signal alarm. In conclusion, the magistrate recommended that this court deny relator's request for a writ of mandamus.
 {¶ 3} Relator has filed the following four objections to the magistrate's decision:
 (1) The Magistrate erred by finding that respondent Industrial Commission of Ohio did not abuse its discretion in refusing to grant a rehearing based on relator The Shelly Company's claim that it cannot be held liable under the specific safety requirement at issue because it was the first time the reverse signal alarm had failed.
 (2) The Magistrate erred by finding that the post-accident inspection evidence provided some evidence to support the determination of respondent Industrial Commission of Ohio that the reverse signal alarm was not working at the time of the accident.
 (3) The Magistrate erred by finding that respondent Industrial Commission of Ohio's citation to the incorrect code section in its order was "simply . . . a typographical error."
 (4) The Magistrate erred by finding that respondent Industrial Commission of Ohio did not abuse its discretion in determining that relator The Shelly Company had violated *Page 3 
 Ohio Adm. Code 4123:1-3-06(D)(2)(a) and (b) based on its finding that the reverse signal alarm was not working at the time of the accident.
 {¶ 4} No objections have been made to the magistrate's findings of fact. After an independent review of the same, we adopt the magistrate's findings of fact as our own. Relator's first, third, and fourth objections contain arguments made to, and addressed by, the magistrate. For the reasons set forth in the magistrate's decision, we do not find relator's position well-taken, and, accordingly, overrule the first, third, and fourth objections.
 {¶ 5} In its second objection, relator contends the magistrate erred in finding that the post-accident inspection evidence provided some evidence to support the staff hearing officer's ("SHO") determination that the reverse signal alarm was not working at the time of the accident. Relator points out that all tests demonstrating the backup signal alarm was not working were conducted post-accident, and thus, argues they could not be used as evidence that the alarm failed to work at the time of the accident. The magistrate addressed this contention as well, and as explained in detail by the magistrate, the post-accident reports were critical because there were no surviving witnesses at the accident scene that were in a position to have heard the reverse signal alarm. Further, it was a reasonable inference that the reverse signal alarm did not function at the time of the accident based upon the undisputed evidence that the alarm was found to be inoperable or working only intermittently after the accident. While relator suggests the wires must have come loose during the attempts to free the decedent from the truck, relator provides only conjecture. Again, for the reasons set forth in the magistrate's decision, relator's second objection is overruled. *Page 4 
 {¶ 6} Following an independent review of the matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, relator's objections to the magistrate's decision are overruled, and we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny the requested writ of mandamus.
 Objections overruled; writ of mandamus denied. *Page 5 
 APPENDIX A MAGISTRATE'S DECISION Rendered on March 29, 2007 *Page 6 {¶ 7} In this original action, relator, The Shelly Company, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its award to respondent Christine Steigerwald for relator's violation of a specific safety requirement ("VSSR").
Findings of Fact: {¶ 8} 1. On October 30, 2000, David J. Steigerwald ("decedent") was killed in an industrial accident that occurred while he was employed with S.E. Johnson Companies, Inc. ("S.E. Johnson"), a predecessor of relator.
 {¶ 9} 2. Thereafter, decedent's surviving spouse, Christine Steigerwald ("claimant"), filed an industrial claim, which was certified by relator and was assigned claim number 00-572334.
 {¶ 10} 3. On July 26, 2001, claimant filed a VSSR application alleging that decedent's death was proximately caused by relator's violations of specific safety requirements.
 {¶ 11} 4. Claimant also filed an intentional tort action against relator in the Cuyahoga County Court of Common Pleas.
 {¶ 12} 5. The VSSR application prompted an investigation by the Ohio Bureau of Workers' Compensation Safety Violations Investigation Unit ("SVIU"). The SVIU investigator issued a report on February 19, 2002. The report contains exhibits and a four-paragraph "Discussion," stating:
 1. The accident of record occurred on October 30, 2000 in a construction zone on the Ohio Turnpike at Milepost 167.6 in Cuyahoga County. David E. Steigerwald was an employee of S. E. Johnson Companies, Inc. and at approximately 8:47 a.m. he was walking east on the west side of the roadway in the driving lane when he was struck by a Ford Model F450 *Page 7 
service truck being operated by James Pennington. Mr. Steigerwald became entangled in the rear axle of the vehicle and the truck came to rest on top of him. Several workers at the scene attempted to lift the vehicle off of Mr. Steigerwald by utilizing two bottle jacks and a front-end loader. The right rear tire of the vehicle had to be removed to free Mr. Steigerwald from the rear axle. Ohio State Highway Patrol troopers and emergency medical technicians arrived on scene to administer first aid and investigate the cause of the accident. Life Flight was dispatched to the scene and the onboard physician pronounced Mr. Steigerwald deceased at approximately 9:45 a.m.
 2. James Pennington was backing up the involved Ford Model F450 service truck eastbound in the driving lane, which was closed to traffic at the time of the accident. Mr. Pennington struck the Decedent with the rear of the vehicle and was unaware that he was behind it. Responding authorities and company representatives interviewed Mr. Pennington regarding the backup alarm and he stated that to the best of his knowledge the alarm on the involved truck worked. However, he does not remember hearing it as he was backing up the truck. He further stated that the backup alarm worked on Friday when the vehicle was parked and this was the first time Monday morning that the truck was backed up.
 3. An OSHA compliance officer and an Ohio State Highway Patrol trooper conducted an inspection of the involved service truck at the accident scene. The OSHA compliance officer and Ohio State Highway Patrol trooper noted in their respective reports that the backup alarm was not working. The OSHA compliance officer noted in his report that S. E. Johnson mechanics later determined that the connector was loose at the transmission. He further noted that the loose connection could have been caused by the victim at the time of the accident or by rescuers working under the truck attempting to free the victim. No citations were issued as a result of the OSHA investigation because the evidence presented was inconclusive.
 4. On October 31, 2000[,] Neil F. Slessman, Elyria region equipment manager for the S. E. Johnson Companies, Inc., inspected the backup alarm on the involved service truck and discovered that it did not work. Mr. Slessman found that the backup alarm switch that screws into the transmission *Page 8 
and the connector that hooks to it were not making good contact. He observed that the backup alarm would work intermittently by wiggling the wires. Neil F. Slessman also believes that the victim could have damaged the backup alarm wires at the time of the accident or the rescuers could have damaged the wires while they were trying to free the victim from the truck.
 {¶ 13} 6. One of the exhibits to the SVIU report is the investigation report of the Ohio State Highway Patrol ("OSHP"). The OSHP report was authored by Trooper Rollins on October 30, 2000, based upon information he collected at the accident scene. The OSHP report indicates that two other officers were at the scene. Those officers were Sergeant Carman and Trooper Berry. According to the OSHP report, "[u]pon the arrival of both back up officers a[n] extensive search for a witness was conducted. So far we have not been able to find anyone who has witnessed] the accident. * * * Tpr. L.D. Berry performed a vehicle inspection of the utility truck involved. Lights, the settings of guages [sic] within the interior such as mirrors, radio volume and equipment warning signal. At the time Trp. L.D. Berry did a[n] inspection, the truck[']s reverse warning signal were [sic] not functioning."
 {¶ 14} Trooper Rollins interviewed James Pennington at the accident scene. In his report, Trooper Rollins recorded Pennington's responses to a series of questions that Trooper Rollins posed. Some of the questions and answers are as follows:
 [Trooper Rollins] Were the back up chimes working while you were backing up?
 [Pennington] Due to traffic I could not hear it[.]
 * * *
 [Trooper Rollins] Was the chime working?
 [Pennington] Yes it has been working. You just couldn't hear it due to traffic noise[.] *Page 9 
 * * *
 [Trooper Rollins] While you were backing up could you see any other workers around?
 [Pennington] No everyone was in front of me.
 [Trooper Rollins] How far were the other workers when you felt the truck rise up?
 [Pennington] About 200 Ft maybe[.]
 * * *
 [Trooper Rollins] Were your windows up or down?
 [Pennington] They were up[.]
 * * *
 [Trooper Rollins] Have you ever had any work done to the reverse alarm on the truck?
 [Pennington] Yes[.] I needed to put ends on the terminal because of corrosion[.]
 [Trooper Rollins] Have you had any other problems with the reverse alarm?
 [Pennington] No[.]
 {¶ 15} 7. Another exhibit to the SVIU report is a recorded interview of Pennington conducted on the date of the accident by David Furiate, Corporate Safety Director for S.E. Johnson and a Stephanie Steinmetz. The interview was conducted at relator's Elyria office conference room. Some of the questions and answers are as follows:
 [Pennington] So I went ahead and sit down in my truck and started getting my paperwork together and rolled my window down and talked to Dave a few more minutes. As I was gathering up my papers, Dave disappeared. I don't know where the man went, which direction. So I proceeded to back eastbound on the shoulder with loaded dump trucks-
 [Steinmetz] To the south, maybe. *Page 10 
 [Pennington] To the south in the driving lane, trying to get past them with probably a twelve inch ledge on the right side of me. So as soon as I could clear the loaded dump trucks, I had to cut over in the driving lane, off of the shoulder, to get by two vehicles that are parked on the shoulder. As I got up the side of the first pickup truck, I felt my truck raise up and that's when I stopped and set my brake, got out and still couldn't see nothing until I got out. And that's when I heard Dave holler and I looked underneath my truck and that's where I found him.
 * * *
 [Pennington] And after that, the rest of the crew that was at the west end of the emergency pull-off, I hollered for them and just a matter of split seconds the whole crew was there to help me get Dave out from underneath the truck.
 * * *
 [Steinmetz] In regards to the backup alarm, I just wanted to verify, you haven't noticed at any time in the past few weeks, or any time this particular date that it was not functional.
 [Pennington] No, no. As far as I know, it has always worked. No, like I told the troopers, three months ago I had to put a wire terminal on it where it corroded, but after that, that's — there were other times that I noticed that I had been outside of my truck or against a building where I could catch an echo off it or something where I could hear it in quiet place, it has worked.
 * * *
 [Steinmetz] How long has this been your job truck? Is it just the season, or have you had it for the last two years you have been working?
 [Pennington] I have had this truck probably fourteen months, fifteen months, somewhere in there.
 [Steinmetz] And when it was given to you, there was a backup alarm already installed on it.
 [Pennington] Right. Everything had already been installed on it. *Page 11 
 * * *
 [Furiate] Okay. And as you were backing up, about how fast were you backing up?
 [Pennington] Maybe one, two mile an hour. * * *
 * * *
 [Pennington] When I was just straightening up, I was backing up and that's when I felt my truck raise up. It was — it was just a rise. There was no thud, nothing. On the right hand side.
 * * *
 [Furiate] The right rear side?
 * * *
 [Pennington] Right. The right rear side.
 [Furiate] Okay. Do you know whether or not your backup alarm was working at the time?
 [Pennington] To the best of my ability, yes. As far as I know, yes it was.
 [Furiate] Okay. But I understand you had to jack the back end of the truck up in order to get him out and to remove the right rear wheels from the truck.
 [Pennington] Right. Right. I was in the cab, the rest of the crew. I gave them my jacks, chains, anything they needed. And they told me to go back to the truck and put my foot on the brake and they jacked it up so it would not roll.
 [Furiate] Right.
 [Pennington] And that's where I stayed until they got him out.
 [Furiate] Okay. You stayed — you stayed inside the cab with your foot on the brakes so there would be no movement of the truck?
 [Pennington] Right. Because it's got a — the emergency brake is on the drive shaft of the truck and when the rear *Page 12 
wheels come off the ground it would move. So, without — that's why I stayed in the truck to keep the front brakes applied.
 * * *
 [Furiate] How many mirrors were you checking as you were backing up?
 [Pennington] I've got two west coast mirrors and I've got two spot mirrors and I was looking in all four of them back and forth just constantly, so I didn't go off the edge, didn't hit no dump trucks, didn't hit no pickup trucks, didn't get the rear-end out in the cones when I made my swing to get over into the driving lane. It was — I was checking them all.
 [Furiate] Okay. And you said west coast mirrors. So those are outside rearview mirrors. One on the right and one on the left, right at the driver's indoor and the passenger's door.
 [Pennington] Yes sir.
 [Furiate] And then you said you had the spot mirrors. Now would you describe those, is that a concave mirror that — a little round mirror that fits on your west coast mirror?
 [Pennington] Right. They are concave or they are rounded so you can see more down and more of around the trucks to take away more blind spots.
 [Furiate] Okay. So you would have very good vision to the rear as you are backing up?
 [Pennington] Right.
 [Furiate] Now you had an inside mirror that's mounted up on your windshield to look back — straight back? Did you use that mirror at all?
 [Pennington] No, the trucks — the beds and stuff that we carry — that mirror is just there — you can't see.
 [Furiate] Okay. You don't have good vision because you normally carry a lot of equipment and everything else in the truck?
 [Pennington] Right. *Page 13 
 {¶ 16} 8. Another exhibit to the SVIU report is a recorded interview of Neil F. Slessman, conducted on November 17, 2000, by Furiate. Slessman is relator's Elyria Regional Equipment Manager. The purpose of the interview, as stated by Furiate at the interviews beginning, was to establish the mechanical condition of the truck involved in the accident and to discuss the backup alarm.
 {¶ 17} According to Slessman, he arrived at the accident scene on October 30, 2000, after the accident occurred: "Upon arrival to the job site, they already had the truck jacked up, the right duals were removed so they could get the gentleman out from under the truck."
 {¶ 18} Some of the questions and answers from the Slessman interview are as follows:
 [Furiate] * * * Did you do anything, any further investigation or checking of the equipment on the truck after it was returned to the Elyria garage?
 [Slessman] We inspected the backup alarm the following day, which would have been October 31 to check to make sure the backup alarm was working. We found that the backup alarm switch that screws into the transmission and the connector that hooks to it was not making good contact. The backup alarm worked intermittently. You would crawl underneath the truck, wiggle the wires and make — or wiggle the connection, make the backup alarm work, but you could also at the same time wiggle that connector and it would break contact and the backup alarm would quit working.
 [Furiate] Okay. What was the purpose of the wire going to the backup alarm that was installed into the transmission?
 [Slessman] The purpose of that was to activate the backup alarm when the truck is put in reverse. You got a wire that feeds power into the switch and when you put it in reverse the forks that are in the transmission go back against a ball *Page 14 
in the switch which causes it to make contact and activates the backup alarm.
 [Furiate] Okay. That's an internal switch inside the transmission that you're talking about that is engaged by moving the lever and the fork inside the transmission and moves the gears into reverse gear, is that correct?
 [Slessman] That is correct.
 * * *
 [Furiate] * * * It's my understanding that there was a switch on the back of the truck underneath a work light. There were two switches there. One operated the work lights and the backup lights and the other one operated the backup alarm, is that correct?
 [Slessman] That is correct.
 [Furiate] What was the purpose of both of those switches?
 [Slessman] The purpose of the switches, you could flip the first switch on would turn on the backup lights plus two additional lights that were put on the service truck and you could use those as work lights. The second switch was put in place because when you would put power to the backup lights, it would also activate the backup alarm. The second switch was put in there to shut the backup alarm off when you were using the backup lights as work lights on the truck.
 [Furiate] Okay. So it had nothing to do, as [sic] that what you are telling me, it had nothing to do with the position of the transmission, whether it was in neutral, forward gear, reverse gear or anything else, is that correct?
 [Slessman] That is correct.
 [Furiate] So in other words, that switch would activate the backup alarm even if the transmission was in neutral gear?
 [Slessman] That is correct.
 [Furiate] Would it also if the ignition was turned off, would it still activate the backup alarm with that switch?
 [Slessman] Yes it would. *Page 15 
 [Furiate] Okay. So then would the backup alarm operate when the truck was put in reverse gear and the — no matter what position that the switch was in, whether it was in an on position or an off position on the back of the truck?
 [Slessman] Yes it would.
 [Furiate] So the backup alarm and the activation of it in reverse gear had nothing to do with that switch, is that correct?
 [Slessman] That is correct.
 [Furiate] Okay. Can you tell me a little bit more about that so that we have a very clear understanding of the operation of the backup alarm and the switch?
 [Slessman] The switch was put on to shut the backup alarm off when you were using the lights that were on the back of the truck as work lights. I was just to disengage the backup alarm so it was not sitting there beeping the whole time you were working with the truck shut off and you were just using them for work lights.
 [Furiate] Okay. And that was because the mechanics work at night out in the field on various jobs and so on, they are working on equipment and they need light in order to do that, is that correct?
 [Slessman] That is correct.
 [Furiate] Okay. So if that switch was turned off, the backup alarm switch was turned off and the mechanic got into the truck and he moved the truck and then he backed up, with that switch turned off, would the backup alarm work?
 [Slessman] The backup alarm would still work because the switch that is in the transmission then would put power to the backup alarm.
 [Furiate] Okay. The internal switch then?
 [Slessman] The internal switch would override that switch.
 [Furiate] Okay. Alright. Now you mentioned that there was a wire corroded or loose and that it would break contact when you were looking at it after the accident happened? *Page 16 
 [Slessman] That is correct.
 [Furaite] Do you have any knowledge yourself whether the backup would have been working at the time that Mr. Pennington was backing up along the road when this accident happened?
 [Slessman] No. I cannot answer that.
 [Furiate] Is it possible that the wire could have been — as Mr. Steigerwald went under the truck that the wire could have been jerked in some way and break contact with it — with the switch?
 [Slessman] That is possible or when the truck was lifted, jacked up to get the wheels off of it, there is a possibility with that happening and the people underneath the truck getting Dave out from underneath it, that could have — the wire could have bumped also and made the connection — made it a loose connection.
 [Furiate] Okay. There was a lot going on after that happened and there were people getting underneath the truck for various reasons to try to free Mr. Steigerwald from underneath the vehicle.
 [Slessman] That is correct.
 [Furiate] Okay. So it's possible that the wire could have been pulled at that time and break contact with the backup alarm?
 [Slessman] That is correct.
 [Furiate] And that wire that went to it, that was a hot wire that brought the electricity to the switch, is that correct?
 [Slessman] That is correct.
 [Furiate] Okay. Was there more than one wire that went to that switch?
 [Slessman] There is [sic] two wires. You've got the hot wire that took the power to the switch and then you had another wire that came out of the switch to activate the backup alarm when the vehicle is put in reverse.
 * * * *Page 17 
 [Furiate] Alright. Okay. Neil, is there anything else that we need to discuss concerning the incident that occurred on the Turnpike or your inspection or assignment of work to be done on that truck to check it out and to check all the equipment out?
 [Slessman] The only other thing, Brian Tucker was the mechanic that I assigned to check out the backup alarm switch on the vehicle. I had Brian do that on November 3. That's when we found that the connector that hooks onto the backup alarm switch, you could move it back and forth and make it break contact. At that point, we ordered a new switch for the transmission and we also ordered a new connector so that everything was back to original and it was tight so that you could not move the connector and make it break contact so the backup alarm would disengage after that. The new switch and connector were — it took a couple days to get them in. I believe we received the parts on Friday, November 4 and were installed that day, putting the truck back in a working status.
 {¶ 19} 9. Another exhibit to the SVIU report presents documents obtained from the United States Department of Labor, Occupational Safety and Health Administration ("OSHA") regarding OSHA's investigation into the accident of October 30, 2000. The OSHA investigation summary, dated January 11, 2001, states:
 David Steigerwald, deceased, was struck by a maintenance vehicle that was backing up on closed down lanes of the Ohio Turnpike. There were cones and barrels as well as flaggers. The crew was installing an emergency pull off apron. The deceased left the apron worksite to apparently pick up his tandem vibratory roller which had just arrived on site. He was walking towards the East when he was struck by a maintenance vehicle that was backing up and navigating parked vehicles. Just as the truck straightened out and was backing directly Eastward the driver felt something akin to backing over a barrel. It turned out to be the deceased. The vehicle apparently had a backup alarm that was by every indication working (but confirmed by no one). The backup alarm may have been overcome by ambient background noise. There were numerous trucks in the adjacent active lane and some would have been using their "jake brakes" on the hill to enable their engines to help *Page 18 
them slow down as they picked up speed going down the grade towards North Royalton. The backup alarm when tested directly after the accident did not work. Mechanics later determined that the connector was loose at the transmission. This could have been caused by the victim or by rescuers under the truck and potentially hanging up on the wires that went to the back-up alarm. This tugging on the wires could easily dislodge the connector. The driver could not hear the backup alarm in the cab with the radio on but was sure the back up alarm worked the previous time he operated the truck. The back-up alarm worked on Friday when the vehicle was parked and this was the first time on Monday morning the truck was backed up.
 {¶ 20} 10. OSHA did not issue a citation to relator regarding the October 30, 2000 accident.
 {¶ 21} 11. On January 22, 2003, Slessman was deposed in the intentional tort action filed in the Cuyahoga County Court of Common Pleas. His deposition was recorded and transcribed. The 149 page transcription was submitted to the commission as evidence to be considered in the VSSR proceeding.
 {¶ 22} 12. During the deposition, Slessman was questioned about his November 17, 2000 recorded interview by Furiate. Claimant's counsel refers to the recorded interview as "your statement." During the deposition, the following exchange was recorded between claimant's counsel and Slessman:
 [Daina B. Van Dervort, Esq., on behalf of plaintiffs] You indicated you instructed Brian Tucker the day after the accident to inspect the vehicle?
 [Slessman] Yes.
 [Van Dervort] If you would turn to Page 4 of your statement. I wanted to ask you some questions.
 * * *
 [Van Dervort] The back-up alarm switch that screws into the transmission that's being referred to here is the screw that *Page 19 
comes into the transmission, the transmission being about half way up the vehicle?
 [Slessman] Approxiamtely, yes.
 [Van Dervort] All right. Just so that I understand which screw is being referred to there.
 The back-up alarm worked intermittently is what your statement says?
 [Slessman] That is correct.
 [Van Dervort] Mr. Tucker reported that to you?
 [Slessman] That is correct.
 [Van Dervort] How far is the transmission switch feet wise from the back of the vehicle, approximately?
 [Slessman] Approximately[,] I would say ten feet, something like that.
 [Van Dervort] Will you turn to Page 6 of your statement, please.
 Approximately a fourth of the way down you're talking again about the back-up alarm and there is a statement which says.
 Question: Now you mentioned that there was a wire corroded or loose and that it would break contact when you were looking at it after the accident happened.
 Answer: That is correct.
 Do you see that?
 [Slessman] Yes.
 [Van Dervort] Do you know which it was, was the wire corroded or was it loose?
 [Slessman] Loose.
 [Van Dervort] And again, that's something Mr. Tucker told you? *Page 20 
 [Slessman] That is correct, yes.
 [Van Dervort] How is the switch, that transmission switch, how is it actually connected into the transmission, is it screwed in?
 [Slessman] Yes.
 [Van Dervort] What is the connection there?
 [Slessman] It is screwed in the transmission.
 [Van Dervort] So if it's loose, the way to correct that is simply to tighten it?
 [Slessman] The switch was not loose, it [has] wires that plugged into the switch that were loose.
 [Van Dervort] How are those wires connected?
 [Slessman] You have a connector, and I am not real sure what the proper term of the connector is, but you have a locking connector that snaps on to that switch to lock it on to the switch itself off the wiring harness.
 [Van Dervort] Is the locking connector, is that a metal device?
 [Slessman] No. It's actually part of the end on the wiring harness. It's a plastic connector.
 [Van Dervort] And that's considered part of the harness?
 [Slessman] Yes.
 [Van Dervort] Anything else that you recall Mr. Tucker telling you about the back-up alarm on this vehicle, again, during that October 31st inspection?
 [Slessman] The only other thing he made mention that was, you know, he could grab ahold of the connector where it plugged into the switch and he could wiggle it and break contact where the back-up alarm would quit working.
 [Van Dervort] And that wasn't supposed to happen, right?
 [Slessman] That is correct. *Page 21 
 {¶ 23} 13. On February 7, 2005, the VSSR application was heard by a staff hearing officer ("SHO"). The proceedings were recorded and transcribed for the record. However, the February 7, 2005 hearing consisted entirely of arguments by counsel. No witness testimony was taken. At the hearing, the SHO requested that the parties file "position statements" within 30 days of the hearing. The parties filed their respective "position statements" on March 7, 2005, as requested by the SHO. Thereafter, no further hearing was conducted by the SHO on the VSSR application.
 {¶ 24} 14. On January 18, 2006, the SHO mailed an order granting the VSSR application. The SHO's order states:
 It is the finding of the Staff Hearing Officer that the injured worker's IC-8 application, filed on July 26, 2001, was amended to request violations of Ohio Administrative Code Sections 4123-3-06(2)(a)(b) [sic]. All other alleged violations were withdrawn. It is the order of the Staff Hearing Officer that the amended application is GRANTED TO THE EXTENT OF THIS ORDER.
 The Staff Hearing Officer finds that the accident that gives rise to the alleged specific safety violation occurred in the following manner:
 On October 30, 2000, David Steigerwald had just finished having a conversation with Jim Pennington. According to Mr. Pennington's statement he did not see which way Mr. Steigerwald went when the conversation had ended. Mr. Pennington began to back up when he felt his truck raise up on the right side. He got out of the truck to see what the problem was and discovered that he had struck Mr. Steigerwald. Shortly after the accident Mr. Steigerwald died as a result of his injuries.
 It is the injured worker's widow's contention that her husband's injuries were a direct result of the employer's failure to comply with the specific safety requirements set forth in Ohio Administrative Code Section 4123-3-06(2)(a)(b) [sic]. This section states: *Page 22 
 (2) On mobile equipment having an obstructed view to the rear, the employer shall:
 (a) Provide a reverse signal alarm audible above the surrounding noise, or
 (b) Provide an observer to signal the assured clear distance.
 The injured worker's widow contends that the way in which the accident occurred, i.e. the injured worker was struck while walking behind the truck, is evidence that the backup alarm was not functioning. If the alarm had been in working order, the injured worker would have heeded its warning and moved out of the way. In addition, the injured worker's widow relies on the statement from Dave Furiate, the employer's safety director. Mr. Furiate states that he arrived shortly after the incident occurred. He asked the workers if anyone had seen the accident occur and no one had seen it. Mr. Furiate goes on to state that On October 31, 2000, the day after the accident the employer took the truck to its garage facility for an inspection. Mr. Furiate stated, "We found that the backup alarm switch that screws into the transmission and the connector that hooks to it was not making good contact. The backup alarm worked intermittently." Mr. Furiate went on to note that contact could be made or broken when one would crawl underneath the truck and wiggle the wires. The injured worker's widow contends that Mr. Furiate's statement shows that the backup alarm was not working.
 The employer contends that the backup alarm was working at the time of the accident. In support of its contention, the employer relies on the October 30, 2000 statement from Mr. Pennington, the truck driver. According to Mr. Pennington, the backup alarm was working at the time of the accident. The employer also asserts that the backup alarm connection must have been disturbed at the time the truck was jacked up to extricate the injured worker.
 The Staff Hearing Officer does not find the employer's position persuasive. The Staff Hearing Officer relies on the fact that the inspections done by the highway patrol and OSHA immediately following the accident revealed that the backup alarm was not working. In addition, the Staff Hearing Officer relies on the employer's inspection done the day following the accident which showed that the backup alarm was not working. The employer has not produced persuasive evidence which shows that the backup alarm failed to work *Page 23 
when inspected because the connecting wires were disturbed during or subsequent to the accident. The employer's claim that the wires must have come loose at the time the truck was jacked up is pure speculation.
 According to Mr. Pennington, his truck was equipped with side view mirrors, spot mirrors, and a rear view mirror. However, he was unable to see the decedent behind the truck when he backed up. Based upon Mr. Pennington's statement, the Staff Hearing Officer finds that the view to the rear of the truck was obstructed. Based upon the employer's post accident inspection, which revealed that the backup alarm worked intermittently, and the fact that no one heard the backup alarm sounding on the date of the accident, the Staff Hearing Officer finds that the backup alarm was not working. Finally, the Staff Hearing Officer finds that there is no evidence that the employer provided an observer to signal the assured clear distance. Therefore, the employer violated Ohio Administrative Code Section 4123-3-06(2)(a)(b) [sic].
 The Staff Hearing Officer finds that the employer's violation of the aforementioned rule is the proximate cause of the inured worker's death. This portion of the Staff Hearing Officer's decision is based on Mr. Pennington's statement he was looking in his mirrors to avoid going off of the curb and he was not moving very fast. Therefore, the Staff Hearing Officer finds that the injured worker would have had sufficient time to move if in fact the backup alarm sounded as it should have. It was the fact that the backup alarm did not sound that caused the injured worker to be killed.
 In addition to the evidence specifically cited herein, the Staff Hearing Officer relies on the Bureau of Workers' Compensation's investigation report, completed by Special Investigator Fred M. Freeman.
 The Staff Hearing Officer therefore orders that an additional award of compensation be granted to the injured worker's widow in the amount of forty percent of the maximum weekly rate under the rule of State ex rel. Engle v. Indus. Comm., 142 Ohio St. 425.
(Emphasis sic.) *Page 24 
 {¶ 25} 15. On February 16, 2006, relator moved for a rehearing pursuant to Ohio Adm. Code 4123-3-20(C).
 {¶ 26} 16. In its motion for rehearing, relator argued:
 * * * The SHO stood VSSR law on its head by shifting the burden of proof from claimant to S.E. Johnson. A plain reading of the SHO order demonstrates that the SHO was requiring S.E. Johnson to prove that it did not commit a VSSR instead of requiring claimant to prove that it did. Instead of applying Ohio Supreme Court precedent to strictly construe the VSSR against its applicability to S.E. Johnson, the SHO went out of her way to do the opposite. For instance, the SHO stated that S.E. Johnson's explanation for why the back up alarm was not working after the accident was "pure speculation," but then proceeded to speculate that the allegedly non-working back up alarm was the proximate cause of Mr. Steigewald's death. There was no evidence that the back up alarm had failed in the past. There was no evidence that S.E. Johnson was aware the alarm was malfunctioning. Thus, even if the back up alarm was not working at the time of the accident, an allegation that S.E. Johnson specifically denies, the company was entitled to immunity based on the first-time failure of the alarm.
(Fn. omitted; emphasis sic.)
 {¶ 27} 17. On March 15, 2006, another SHO mailed an order denying relator's motion for rehearing. The SHO's order mailed March 15, 2006, states:
 It is hereby ordered that the motion for rehearing filed 02/16/2006 be denied. The Employer has not submitted any new and relevant evidence nor shown that the order of 02/07/2005 was based on an obvious mistake of fact or on a clear mistake of law.
 It is found that the requirements of OAC 4121-3-10(C)(1)(a) or (b) have not been met, and that the request for a VSSR rehearing must be denied.
 {¶ 28} 18. On June 12, 2006, relator, The Shelly Company, filed this mandamus action. *Page 25 
Conclusion of Law: {¶ 29} Two main issues are presented: (1) whether the post-accident inspection evidence provided the commission with some evidence to support its determination that the reverse signal alarm was not working at the time of the accident, and (2) whether the commission abused its discretion in refusing to grant relator a rehearing based upon its claim that it cannot be held liable under the specific safety rule for an alleged first time failure of the reverse signal alarm.
 {¶ 30} The magistrate finds: (1) the post-accident inspection evidence did provide the commission with some evidence to support its determination that the reverse signal alarm was not working at the time of the accident, and (2) the commission did not abuse its discretion in refusing to grant relator a rehearing based upon its claim that it cannot be held liable under the specific safety rule for an alleged first time failure of the reverse signal alarm.
 {¶ 31} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 32} Ohio Adm. Code 4123:1-3 provides specific safety requirements relating to construction. Ohio Adm. Code 4123:1-3-06 is captioned "Motor vehicles, mechanized equipment and marine operations."
 {¶ 33} Ohio Adm. Code 4123:1-3-06(B)(3) provides the following definition: "`Motor vehicles' (as covered by this rule) means all those vehicles that operate within an off-highway jobsite, not open to unrestricted public traffic."
 {¶ 34} Ohio Adm. Code 4123:1-3-06(D) is captioned "Motor vehicles." It states in part: *Page 26 
 (1) All trucks shall be equipped with an audible warning device, in an operable condition, at the operator's station.
 (2) On mobile equipment having an obstructed view to the rear, the employer shall:
 (a) Provide a reverse signal alarm audible above the surrounding noise, or
 (b) Provide an observer to signal the assured clear distance.
 {¶ 35} In determining that the backup alarm was not working at the time of the accident, the SHO relied upon largely undisputed evidence that the backup alarm was inoperable or that it worked only "intermittently" when it was inspected after decedent had been extricated from underneath the vehicle.
 {¶ 36} Apparently, no surviving witness at the accident scene was in a position at the time of the accident where it would be reasonably expected that they would have heard a reverse signal alarm emanating from the vehicle at issue had the reverse signal alarm been working. That is, no person at the accident scene at the time of the accident came forward to report that they were close enough to the reversing vehicle at the time of the accident to have heard a reverse signal alarm if the reverse signal alarm was working.
 {¶ 37} Moreover, at the time of the accident, Pennington was inside the cab with the widows rolled up and the radio on.
 {¶ 38} Thus, the undisputed evidence resulting from the post-accident inspections was critical to the commission's determination as to whether the reverse signal alarm was working immediately before decedent was run over by the service truck.
 {¶ 39} The critical question before the SHO was whether a reasonable inference can be drawn that the reverse signal alarm did not function at the time of the accident *Page 27 
based upon the undisputed evidence that the alarm was found to be inoperable or to be working only intermittently after the accident.
 {¶ 40} It is well-settled law that the claimant has the burden of proving a VSSR by a preponderance of the evidence. State ex rel. SupremeBumpers, Inc. v. Indus. Comm., 98 Ohio St.3d 134, 2002-Ohio-7089, at ¶ 71. Thus, in the VSSR proceeding at issue, the burden was upon Christine Steigerwald, as claimant, to prove that the reverse signal alarm was not functioning at the time of the accident.
 {¶ 41} Restating well-settled law, the court in Supreme Bumpers
states:
 * * * This court has never required direct evidence of a VSSR. To the contrary, in determining the merits of a VSSR claim, the commission or its SHO, like any factfinder in any administrative, civil, or criminal proceeding, may draw reasonable inferences and rely on his or her own common sense in evaluating the evidence. * * *
Id. at ¶ 69.
 {¶ 42} It has also been held that in meeting the burden of proof, the claimant is not required to disprove a negative. State ex rel. Ignatiousv. Indus. Comm., 99 Ohio St.3d 285, 290, 2003-Ohio-3627.
 {¶ 43} If decedent had not been drawn underneath the reversing vehicle, and thus no extrication efforts had occurred, the inference would be unquestionably compelling from the post-accident inspection evidence that the alarm was not functioning at the time of the accident.
 {¶ 44} Clearly, relator did claim that the wires connected to the reverse signal alarm could have been disturbed during the extrication efforts or even as the accident was happening. *Page 28 
 {¶ 45} The SHO's order indicates that the SHO placed the burden of proof upon relator to show that it was the extrication efforts or the accident itself that loosened the wires connecting the reverse signal alarm. In this regard, the SHO's order states in pertinent part:
 * * * The employer also asserts that the backup alarm connection must have been disturbed at the time the truck was jacked up to extricate the injured worker.
 The Staff Hearing Officer does not find the employer's position persuasive. The Staff Hearing Officer relies on the fact that the inspections done by the highway patrol and OSHA immediately following the accident revealed that the backup alarm was not working. In addition, the Staff Hearing Officer relies on the employer's inspection done the day following the accident which showed that the backup alarm was not working. The employer has not produced persuasive evidence which shows that the backup alarm failed to work when inspected because the connecting wires were disturbed during or subsequent to the accident. The employer's claim that the wires must have come loose at the time the truck was jacked up is pure speculation.
 {¶ 46} The commission, through its SHO, did not abuse its discretion by shifting the burden of proof to relator such that relator was required to prove that the reverse signal alarm was rendered inoperable by the extrication efforts or by the accident itself. Had the SHO placed the burden on claimant to prove that the reverse signal alarm was not rendered inoperable by the extrication efforts or by the accident itself, claimant would have been required to disprove a negative, in violation of the principles set forth in Ignatious.
 {¶ 47} The SHO found that relator's theory as to how the alarm became inoperable at the time of the post-accident inspections is based upon "pure speculation." The SHO's *Page 29 
finding that relator's theory or claim was premised upon "pure speculation" is supported by the record.
 {¶ 48} Indeed, no one present at the accident scene during the extrication efforts testified or stated that the reverse signal alarm or any of its connecting wires or switches were disturbed during the extrication efforts. At best, relator can point to the statements of Furiate and Slessman during Slessman's November 17, 2000 interview:
 [Furaite] Do you have any knowledge yourself whether the backup would have been working at the time that Mr. Pennington was backing up along the road when this accident happened?
 [Slessman] No. I cannot answer that.
 [Furiate] Is it possible that the wire could have been — as Mr. Steigerwald went under the truck that the wire could have been jerked in some way and break contact with it — with the switch?
 [Slessman] That is possible or when the truck was lifted, jacked up to get the wheels off of it, there is a possibility with that happening and the people underneath the truck getting Dave out from underneath it, that could have — the wire could have bumped also and made the connection — made it a loose connection.
 [Furiate] Okay. There was a lot going on after that happened and there were people getting underneath the truck for various reasons to try to free Mr. Steigerwald from underneath the vehicle.
 [Slessman] That is correct.
 {¶ 49} The SHO could correctly characterize the above statements from Furiate and Slessman as "pure speculation." Neither Furiate nor Slessman have claimed any expertise in the matter. Both only stated that it was "possible" that the reverse signal alarm could have been rendered inoperable by the accident itself or the extrication efforts. *Page 30 
 {¶ 50} Based upon the above analysis, it is clear that the post-accident inspection evidence provided the commission with some evidence, if not compelling evidence, to support its determination that the reverse signal alarm was not working at the time of the accident.
 {¶ 51} The second issue is whether the commission abused its discretion by refusing to grant relator a rehearing based upon its claim that it cannot be held liable under the specific safety rule for an alleged first time failure of the reverse signal alarm.
 {¶ 52} It has been held that a first time failure of a safety device cannot sustain a finding of a VSSR violation absent employer knowledge of the defect. State ex rel. Maghie Savage, Inc. v. Nobel (1998),81 Ohio St.3d 328, 330; State ex rel. Taylor v. Indus. Comm. (1994),70 Ohio St.3d 445, 447; State ex rel. M.T.D. Products v. Stebbins (1975),43 Ohio St.2d 114.
 {¶ 53} Here, relator did not raise at the January 18, 2006 hearing the defense of a first time failure of the reverse signal alarm. However, in its motion for rehearing, relator raised the defense for the first time. As previously noted, the commission, through its SHO, denied rehearing.
 {¶ 54} Ohio Adm. Code 4121-3-20(C) provides:
 (1) If the motion for rehearing is filed, a staff hearing officer, after the expiration of the answer time, shall review the motion for rehearing under the following criteria:
 (a) In order to justify a rehearing of the staff hearing officer's order, the motion shall be accompanied by new and additional proof not previously considered and which by due diligence could not be obtained prior to the prehearing conference, or prior to the merit hearing if a record hearing was held and relevant to the specific safety requirement violation. *Page 31 
 (b) A rehearing may also be indicated in exceptional cases where the order was based on an obvious mistake of fact or clear mistake of law.
 (2) If the motion for rehearing does not meet the criteria as outlined in paragraph (C)(1)(a) or (C)(1)(b) of this rule, the motion shall be denied without further hearing.
 In its motion for rehearing, relator argued:
 The SHO order was based on a clear mistake of law because there was no evidence that the back up alarm on the service truck driven by Mr. Pennington did not work before the accident thereby putting S.E. Johnson on notice of a VSSR.
 The SHO erred in granting claimant's VSSR application because there was no evidence that the back up alarm was not working before the accident, or that S.E. Johnson had knowledge that the alarm was not working. All of the evidence addressing whether the back up alarm was working prior to the accident shows that it was. Accordingly, the SHO ignored well-settled VSSR law that "a first-time failure of a safety device cannot sustain a finding of a violation, absent employer knowledge of the defect." State ex rel. Maghie Savage, Inc. v. Nobel
(1998), 81 Ohio St.3d 328, 330.
(Emphasis sic.)
 {¶ 55} Here, claimant argues:
 Relator contends that the Commission abused its discretion by granting the VSSR application and not applying the first-time failure defense. * * * Relator proceeds to discuss case law containing facts showing that there had never previously been another failure of the equipment in those other cases. First, Relator waived this "first-time failure" defense by not raising it prior to the Commission's Order. Relator did not raise the defense at the hearing. * * * Moreover, Relator did not raise the defense in its Position Memorandum filed prior to the Commission's Order. * * * Therefore, Relator's criticisms of the Commission for not applying the first-time failure defense are unfounded.
(Claimant's brief, at 21.) *Page 32 
 {¶ 56} In its reply brief, relator argues:
 * * * There is no legal authority to support the proposition that an employer cannot raise a defense for the first time in its motion for rehearing, or that by failing to raise it earlier the defense is somehow waived. The issue was properly before the Commission as a result of Shelly's Motion for Rehearing, and given the lack of any evidence of a prior failure of the back up alarm, the Commission abused its discretion by failing to grant the Motion for Rehearing and deny the VSSR application on the basis of the "first-time failure" defense.
(Relator's reply brief, at 10.)
 {¶ 57} The magistrate agrees with the position of claimant.
 {¶ 58} Ohio Adm. Code 4121-3-20(C) provides for rehearing only under the circumstances specified in the rule. One of those circumstances is the existence of a "clear mistake of law." That is the basis upon which relator claims that it was entitled to rehearing under Ohio Adm. Code4121-3-20(C).
 {¶ 59} It is difficult to see how the SHO committed a clear mistake of law in failing to address relator's defense to the VSSR when relator failed to raise the defense either at the February 7, 2005 hearing, or in its post-hearing position statement.
 {¶ 60} In State ex rel. Quarto Mining Co. v. Foreman (1997),79 Ohio St.3d 78, the court states:
 "Ordinarily, reviewing courts do not consider questions not presented to the court whose judgment is sought to be reversed." Goldberg v. Indus. Comm. (1936), 131 Ohio St. 399, 404 * * *. See, also, State ex rel. Moore v. Indus. Comm. (1943), 141 Ohio St. 241, * * * paragraph three of the syllabus; State ex rel. Gibson v. Indus. Comm. (1988), 39 Ohio St.3d 319, 320 * * * (rule that issues not previously raised are waived is applicable in an appeal from a denial of a writ of mandamus). Nor do appellate courts have to consider an error which the complaining party "could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by *Page 33 
the trial court." State v. Williams (1977), 51 Ohio St.2d 112, 117 * * *.
 These rules are deeply embedded in a just regard for the fair administration of justice. They are designed to afford the opposing party a meaningful opportunity to respond to issues or errors that may affect or vitiate his or her cause. Thus, they do not permit a party to sit idly by until he or she loses on one ground only to avail himself or herself of another on appeal. In addition, they protect the role of the courts and the dignity of the proceedings before them by imposing upon counsel the duty to exercise diligence in his or her own cause and to aid the court rather than silently mislead it into the commission of error. Id., 51 Ohio St.2d at 117 * * *. See, also, State v. Driscoll (1922), 106 Ohio St. 33, 38-39 * * *
Id. at 81.
 {¶ 61} In effect, relator is arguing here that it was the duty of the SHO to raise the issue of a first time failure of the safety device and to adjudicate that issue in the order in the absence of relator having raised the defense before the SHO. Relator's position is contrary to well-settled principles that govern administrative or judicial proceedings. Quarto Mining.
 {¶ 62} Accordingly, the commission did not abuse its discretion in refusing to grant relator a rehearing.
 {¶ 63} Besides the two main issues previously addressed here, relator also argues that the commission failed to apply the appropriate standard of proof in a VSSR proceeding. As previously noted, it is well-settled law a claimant has the burden of proving a VSSR by a preponderance of the evidence. Supreme Bumpers. However, relator here argues that "[t]he standard to prove a VSSR is much higher." (Relator's brief, at 12.) *Page 34 
 {¶ 64} Relator suggests that the preponderance of the evidence standard is supplanted by the "strict construction standard required in the adjudication of VSSR applications." (Relator's brief, at 13.) Relator apparently believes that the so-called strict construction rule applies to the commission's role in weighing the evidence. Relator is incorrect.
 {¶ 65} In Supreme Bumpers, the Supreme Court of Ohio addresses the flaw in the argument relator presents here:
 * * * [T]he strict-construction rule does not apply in resolving factual disputes. It is a rule of statutory, not evidentiary, interpretation, devised only as a guide to interpreting the specific requirements of a safety standard in VSSR claims.
Id. at ¶ 70.
 {¶ 66} In short, the strict construction rule has nothing to do with the appropriate standard of proof in a VSSR proceeding. Thus, relator's invocation of the strict construction rule here lacks merit.
 {¶ 67} Relator also argues that the commission's VSSR award is premised upon a nonexistent code section. The SHO's order does incorrectly cite to the code section at issue. However, the SHO's order also quotes the code section at issue. Thus, it is clear that the SHO's order simply contains a typographical error in the citation to the code section that relator was found to have violated. Clearly, relator has not been prejudiced in any way by the typographical error in the SHO's order.
 {¶ 68} Relator also argues that the commission's finding that the reverse signal alarm was not working at the time of the accident will only support a violation of Ohio Adm. Code 4123:1-3-06(D)(1) but the commission found a violation of Ohio Adm. Code *Page 35 4123:1-3-06(D)(2)(a) and (b) instead. According to relator, in order to find a violation of Ohio Adm. Code 4123:1-3-06(D)(2)(a) and (b), the commission was required to find that the reverse signal alarm was not audible above the surrounding noise. Relator's argument lacks merit.
 {¶ 69} Obviously, a reverse signal alarm that did not work at the time of the accident was not audible above the surrounding noise at the time of the accident. Clearly, the commission did not abuse its discretion in determining that relator had violated Ohio Adm. Code 4123:1-3-06(D)(2)(a) and (b) based upon its finding that the reverse signal alarm was not working at the time of the accident.
 {¶ 70} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.