DECISION
{¶ 1} Relator, John W. Johnson, commenced this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying his application for an additional award for alleged violations of specific safety requirements ("VSSR"), and to enter a VSSR award against respondent Buckner and Sons Masonry, Inc. ("Buckner"). *Page 2 
 {¶ 2} This court referred the matter to a magistrate of this court, pursuant to Civ.R. 53 and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) Therein, the magistrate determined that the commission did not abuse its discretion in interpreting the three specific safety rules at issue to be inapplicable to the circumstances of this case. The magistrate therefore recommended that this court deny relator's request for a writ of mandamus. Relator has filed an objection to the magistrate's decision. Therefore, this matter is now before this court for a full, independent review.
 {¶ 3} Relator's objection to the magistrate's decision states as follows:
 The Magistrate erroneously concluded that the Commission did not abuse its discretion when it impermissibly inserted language into the three specific safety rules relating to scaffolding, resulting in an interpretation that those same three specific safety rules are only applicable to "completed" scaffolds.
 {¶ 4} In support of his objection, relator essentially sets forth the same arguments that were considered and adequately addressed by the magistrate. We agree with the magistrate's analysis of the pertinent issues in this action. For the reasons set forth in the magistrate's decision, we find relator's arguments in support of his objection to be unpersuasive. Consequently, we overrule relator's objection to the magistrate's decision.
 {¶ 5} After independently reviewing this matter, we conclude that the magistrate has properly discerned the pertinent facts and applied the relevant law to those facts. Thus, we adopt the magistrate's decision as our own, including the magistrate's findings of fact and conclusions of law. In accordance with the magistrate's decision, we deny the requested writ of mandamus.
 Objection overruled; writ denied. *Page 3 
TYACK, J., concurs.
 SADLER, J., dissents. *Page 8 
 APPENDIX A MAGISTRATE'S DECISION Rendered February 12, 2008 IN MANDAMUS {¶ 15} In this original action, relator, John W. Johnson, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying his application for an additional award for alleged violations of specific safety requirements ("VSSR"), and to enter a VSSR award against respondent Buckner and Sons Masonry, Inc. ("Buckner"). *Page 9 
Findings of Fact: {¶ 16} 1. On February 11, 2003, relator sustained an industrial injury in the course of his employment as a laborer for Buckner. On that date, relator fell from a collapsing scaffold as he was working to erect the scaffold.
 {¶ 17} 2. On July 28, 2004, relator filed a VSSR application alleging violations of Ohio Adm. Code 4123:1-3-03 relating to personal protective equipment and Ohio Adm. Code 4123:1-3-10 relating to scaffolding. The VSSR application form asks the applicant to describe how the injury occurred. In response, relator stated:
 Claimant was on scaffolding 16 ft in air attaching safety pole to the scaffolding in high winds. Adjacent scaffolding already had safety braces in place. A gust of wind blew over claimant's scaffolding while claimant was securing the safety pole. No safety harnesses or lifelines provided.
 {¶ 18} 3. The VSSR application prompted an investigation by the Ohio Bureau of Workers' Compensation Safety Violations Investigations Unit ("SVIU"). The SVIU investigator issued a report on December 22, 2004, containing multiple exhibits.
 {¶ 19} 4. Among the exhibits to the SVIU report is relator's affidavit executed October 21, 2004, stating:
 [One] I am the claimant in the above-referenced VSSR claim. Buckner Sons Masonry Inc. ("Buckner Sons") hired me in January 2002 as a laborer. My general job duties included, but were not limited to: mixing and preparing mortars for masons, setting block for masons, building scaffold and anything else that the masons needed done.
 [Two] On the date of my injury, I had just completed making mortar. I was told that I needed to help set scaffold. The supervisor, "Shorty", told me to climb up on the platform to set the safety poles. As I was setting a safety pole, the scaffold started to collapse. I fell approximately sixteen (16) feet or two (2) bucks to the ground.
 * * * *Page 10 
 [Four] When I was injured, the weather conditions were windy and cold. We should not have been trying to set up scaffold or working from scaffold because of the wind speed.
 [Five] Only part of the scaffold collapsed because the side closest to the block was tied up. Buckner Sons never provided me with any type of safety harness or other fall protection device. I do not recall during my year of employment seeing any Buckner Sons employees with safety harness.
 [Six] Prior to my employment, I had taken a trade course in brick masonry. Buckner Sons had me start as a laborer and they provided me with some training. The training consisted of watching a video. I knew some about setting up scaffolding from my prior experience, but some of it I learned on the job. The video showed safety harnesses, but these items were not provided by Buckner Sons.
 {¶ 20} 5. Also among the exhibits to the SVIU report is the affidavit of David Dempsey executed February 11, 2005, stating:
 [One] I have been an employee of Buckner Sons Masonry Inc. ("Bucker Sons") for several years and was employed by Buckner and Sons on February 11, 2003. On that date, I was working on the O.P.A.T.A. project in London, Ohio and I witnessed the incident in which John Johnson said he fell from the scaffold.
 [Two] On and about February 11, 2003, safety harnesses and other safety equipment were on the job site, accessible, and available for all the employees to use. All Buckner Sons employees, including John Johnson, knew where the safety harnesses and other equipment were kept.
 [Three] John Johnson and I were on different levels of the scaffold as we were erecting it. John was on the first level up, which was approximately 6 or 7 feet off the ground. I was on the third level up, which was approximately 18 to 21 feet off the ground.
 [Four] The weather was cold and a little windy. We were putting plastic around the scaffold as part of setting it up. Before the scaffold was completely set up, a big gust of wind came suddenly and got under the plastic. When the big gust *Page 11 
of wind caught the plastic, the scaffold started to move. I ran to the other scaffold that was completely set up. John started to run but didn't get off the scaffold. The scaffold tipped over.
 [Five] John was not wearing a safety harness. I believe that if he was wearing his safety harness at that time he would have gotten seriously injured because he would not have been able to clear the area quickly enough.
 {¶ 21} 6. Also among the exhibits to the SVIU report is the affidavit of Sylvester Crump executed February 11, 2005, stating:
 [One] I have been an employee of Buckner Sons Masonry Inc. ("Buckner Sons") for several years and was employed by Buckner and Sons on February 11, 2003. On that date, I was working on the O.P.A.T.A. project in London, Ohio and I witnessed the incident in which John Johnson said he fell from the scaffold.
 [Two] On and about February 11, 2003, safety harnesses and other safety equipment were on the job site, accessible, and available for all the employees to use. All Buckner Sons employees, including John Johnson, knew where the safety harnesses and other equipment were kept.
 [Three] John Johnson and David Dempsey were on different levels of the scaffold as they were erecting it. John was on the first level up, which was approximately 6 or 7 feet off the ground. David was on the third level up, which was approximately 18 to 21 feet off the ground.
 [Four] The weather was cold and a little windy. We were putting plastic around the scaffold as part of setting it up. Before the scaffold was completely set up, a big gust of wind came suddenly and got under the plastic. When the big gust of wind caught the plastic, the scaffold started to move. David ran to the other scaffold that was completely set up. John started to run but didn't get off the scaffold. The scaffold tipped over. It did not fall completely to the ground because the forklift had been moved up next to it before this happened. The forklift kept the scaffold from falling completely to the ground.
 [Five] I saw John jump off the scaffold as it tipped over. John was not wearing a safety harness. I believe that if he was wearing his safety harness at that time he would have gotten *Page 12 
seriously injured because he would not have been able to clear the area quickly enough.
 * * *
 [Seven] Buckner Sons provided John and all of its employees with the necessary safety equipment, including safety harness. The weather was okay to be putting up the scaffold. We were surprised by the sudden big gust of wind that caught the plastic.
 {¶ 22} 7. On July 21, 2005, relator's VSSR application was heard by a staff hearing officer ("SHO"). The hearing was recorded and transcribed for the record. At the hearing, three witnesses testified. Besides relator, there was testimony from Otis Buckner and David Dempsey. Otis Buckner is the owner of Buckner and Sons Masonry, Inc.
 {¶ 23} At the start of relator's direct examination, the following exchange was recorded:
 [Relator's counsel] John, if you would, can you tell the hearing officer what happened to you on February 11 of 2003?
 [Relator] On that day we were setting the plastic over the scaffold so that we could work in the wintertime. The winds was kind of high. It was cold. After that was done, we were ordered to help finish putting the safety rails up on the scaffold.
 So I went up to put the safety rail up, and Sylvester Johnson (sic) and I don't know whoever else was helping him gave me the safety rail so I could put it up on the second level. It's heavy now. So while they was hoisting it up to me, I was grabbing it to put it up on the buck — that's the other part of the scaffold — to lock it down.
 And as we were doing that, you know, it got to moving. And the only thing I was thinking about was that I was losing strength. I was trying to grip it to get it up high, but I'd never been in that situation, and it was moving. *Page 13 
 [Relator's counsel] When you say "it was moving," are you talking about the safety pole or —
 [Relator] The scaffold was moving. So as it was moving, the other guy started running. It was too late for me. So I reach up and grabbed the buck up over my head. Now, they say the buck is 6 feet high. Okay. I'm grabbing up under the top of the other 6-foot pole and pulling my legs up to hold on.
In response to a question from the SHO, relator testified:
 * * * When I got to work, I was ordered to go up and help set scaffold; and that's what we done. First of all, we was on the ground making sure the plastic was secured, which we had a hard time doing that, I mean, a real hard time doing that because the wind was blowing into the plastic. Maybe we shouldn't have been out there, you know.
 As we was leaving and had to go back up and set the safety poles, I think the safety poles, something should have been set on the other side of the scaffold, you know, because the wind was blowing into the plastic, you know, a lift or a pole or something to help that end up because it's blowing into the plastic, you know, this way.
 But we was putting the pole up on the other side because that probably helped the wind because of the weight of the pole. When the wind hit it, you know, it just went.
 {¶ 24} Following relator's direct examination, relator's counsel was allowed to make an argument:
 We're submitting to you that our argument to you is that the footing was not sound and rigid because the scaffolding gave way and fell over when the wind blew and that that should be a violation of the specific safety requirement and that if there is an argument that the footing was sound and rigid and that the cause of the fall was the wind, that argument should fail if that argument is set forth because footing needs to be sound and rigid enough so that the scaffolding doesn't fall over.
 In Subsection 11 from that same section. It says, "The poles, legs, or uprights of scaffolds shall be plumb and securely and rigidly braced to prevent swaying and displacement." And in the present case, the safety brace was not securely *Page 14 
braced to prevent swaying and displacement. It was in the process of being installed by Mr. Johnson at the time and —
 * * *
 * * * The last subsection under 4123:1-3-10 that we would draw your attention to is Subsection (F)(1), which indicates, "Scaffolds shall be properly braced by diagonal braces for securing vertical members together laterally, and the cross braces shall be of such length as will automatically square and align vertical members so that the erected scaffold is always plumb, square, and rigid. All brace connections shall be made secure."
 And our argument to you would be that the scaffold that Mr. Johnson was working on was not properly braced by diagonal braces. The connections were not secure enough to prevent the collapse of the scaffolding on which he was working at the time and that his testimony and its borne out in the medical records as well and also, I think, in the affidavits submitted by the employer and the employer's employees that the scaffolding did collapse. It wasn't stable enough to prevent it from collapsing in the wind.
 We would indicate to you or argue to you that that subsection has also been violated and would constitute a violation of a specific safety requirement.
 {¶ 25} Following the above-quoted arguments from relator's counsel, the SHO questioned relator:
 [SHO] Were there diagonal braces or cross braces up?
 [Relator's counsel] Can you explain? He's asking — and I should have been more clear when I was directing your attention to that. Can you tell me about cross braces on the scaffolding that you were working on?
 [Witness] Those were set. That set goes across between each buck. They're like an X.
 [SHO] I mean, the scaffold you were on had cross braces?
 [Witness] Yes.
 [SHO] How about diagonal braces? *Page 15 
 [Witness] It didn't have — the diagonal braces would be the safety poles. We were setting the safety poles, which are real heavy and big. And in the process of doing that was when the wind blew into the plastic while I had the thing in my hand, and all I had to do was let go and grab the buck of the scaffold and hold on as the wind blew into the plastic and blew over the beginning of the scaffold that we was setting.
 {¶ 26} During his direct examination, Otis Buckner testified:
 For the record, the scaffold was erected properly from the base. The scaffold did not go all the way down to the ground. The forklift was there in order to erect the scaffold. And as they were erecting the scaffold, that's when they were putting on the last pole bracing, which would go both directions on the scaffold.
 You brace the scaffold from about the third buck down. The third buck up, you have a brace on that particular scaffold there. And all in between there are what they call safety pins that go between each buck that holds that buck steady on top of the other buck; and there were braces, continuing braces.
 When I was there, the braces did bend some because of the twisting of the scaffold. The scaffold that was next to that was already in place, braces on both sides, as a complete scaffold. The scaffold they were on was a scaffold that was being erected. Therefore, there may not have been the safety poles tightly in place because they were in the process of being erected.
 Other than that, the base, the rugged base and everything, nothing sank. Nothing went down underneath of the scaffold. The base stayed solid, and really the base itself stayed. It didn't even move. It was the scaffold that was above there that began to bend as the wind force went against the scaffold and the twisting of the scaffold.
 The reason why it twisted, the forklift was there. And when it came back some, it came back up against the forklift at which the end twisted some more because you had that force of the forklift holding it up there in certain sections.
 {¶ 27} During the direct examination, the SHO asked Otis Buckner some questions. The following exchange occurred: *Page 16 
 [SHO] Let me just ask. I think you've talked about this, but please go through again about why you feel that the footing or anchorage was sound on the scaffold.
 [Buckner] Yes, sir. According to the guidelines which OSHA requires of us to do, all that was completed at the base; and that is done before anything else goes on top of there. That's the base of the scaffold. When the attorney talked about the ruggedness of having a base so it would not sink, all that was completed first. That's completed before you put the second round on, and that was in place.
 [SHO] You're saying the footing was sound as far as it went?
 [Buckner] Yes, sir. It was sound. You know, it was already complete. It was sound. It never separated itself from the base at all. It remained on the base.
 [SHO] And the poles and the legs and the uprights —
 [Buckner] — were in place, yes, sir.
 [SHO] And they were securely attached?
 [Buckner] Attached, yes, they were. They had safety pins because the base itself was already in place. And the scaffold didn't separate itself. It's more like tilted over and not separated itself from the other bucks.
 [SHO] And did the scaffold have cross braces and diagonal braces?
 [Buckner] Yes, sir, continual braces all the way through because that's what holds, you know, one buck to the other together.
 [SHO] And what is the reason you think it fell over or tipped over?
 [Buckner] Well, the gust of wind which came in, the force of the wind came in. And according to that, there was a piece of plastic there; and the wind probably pulled the plastic. And sometimes the wind can get underneath the boards and things and cause the scaffold to go just from the force of the wind.
 [SHO] The force of the wind was strong enough to push it? *Page 17 
 [Buckner] Yeah, the wind itself. That's when the gust of wind came up.
 [SHO] So you're saying structurally it was sound?
 [Buckner] Yes, sir. The base and everything was down in place, yeah. And the only thing that I would say was not completed was the safety poles themselves because they were erecting those because the scaffold is now at the location where you can put the poles on. Before the scaffold was not at that location.
 They had — Mr. Johnson was on the first level. The other guys was on the second level where the poles would go on that third buck. The poles would have been braced to that third buck down to the ground and that's what they were in the process of doing.
 {¶ 28} During his cross-examination by relator's counsel, Otis Buckner testified:
 [Relator's counsel] Do you know who this Jeannie Mitchell is?
 [Buckner] Jeannie Mitchell was one of the safety people.
 [Relator's counsel] Is she a safety person with Kokosing or with you?
 [Buckner] She was at the time with Buckner and Sons. She is no longer with us.
 [Relator's counsel] She indicates on that, if I read it correctly, that there is one safety provision that was not being followed and that is we hadn't tied off the scaffolding?
 [Buckner] Because the scaffolding had not been at the place to be tied off. It was being erected.
 [Relator's counsel] This also indicates under the corrective and preventive action, brace all scaffolding before plastic is attached. Better secure plastic. Check all braces to make sure no defects. Put more than one nail in mud seal plates to help anchor the scaffolding, and make sure scaffolding is inspected every morning by a competent person.
 [Buckner] Yes. Each morning that's what we did when we go to the site each morning. Those are things that she had wrote down that we check each time on the scaffold because *Page 18 
on the job we always had an inspection that takes place before the people enter onto the scaffold because of one incident that was one time where they had one nail in the scaffold or whatever.
 And on that particular job, as we go through our safety meetings, if we find something that is wrong when we do our safety meeting, then we correct those things. And that was what was written concerning that.
 That's how we — that's how we take safety precautions to make sure things are put in place correctly. Although the scaffolding and everything is already up, we go back and check it every morning before the people get on the scaffold. And I think that Mr. Johnson knows that each morning that's what we had to do in our safety meeting, have a safety person check the scaffold before they get on there even if they was on the scaffold the day before.
 [Relator's counsel] Was there any rule or provision that you had that it would be checked every morning and signed off on by an inspector every morning?
 [Buckner] Yes. Corna/Kokosing had an inspector there. Even their supervisor/superintendent would have to see that it was signed. They had a ticket that hangs on the scaffold. When that supervisor walks by, he sees that ticket on that scaffold hung there and sees that everything has been checked.
 {¶ 29} 8. Following the July 21, 2005 hearing, the SHO issued an order denying the VSSR application. The SHO's order states:
 On the day of injury, the claimant, a laborer, helped to place plastic over a scaffold under construction. After placing plastic over the scaffold the claimant was told to put up safety rails. The claimant climbed on top of the first platform (buck) of the scaffold, which per the Bureau of Workers' Compensation investigator, was six feet six inches high.
 As the claimant was trying to position a safety rail up onto the second level a gust of wind came up causing the scaffold to be pushed down near to or at ground level. The action of the scaffold falling over caused the claimant to fall off the scaffold to the ground incurring the injuries of record.
 * * * *Page 19 
 Rule 4123:1-3-10(C)(1) states that the footing or anchorage for scaffold shall be sound, rigid, and capable of carrying four times the maximum rated load without settling or displacement and that unstable or loose objects shall not be used to support scaffolds.
 4123:1-3-10(C)(11) stated that poles, legs, or uprights of scaffolds shall be plumb and securely and rigidly braced to prevent swaying and displacement.
 4123:1-3-10(F)(1) states that,
 "Scaffolds shall be properly braced by diagonal braces for securing vertical members together laterally, and the cross braces shall be of such length as will automatically square and align vertical members so that the erected scaffold is always plumb, square, and rigid. All brace connections shall be made secure."
 The Staff Hearing Officer finds that all three of these rules are designed to ensure that completed scaffolds must be safe in that the anchorage, poles, and legs of a completed scaffold must be properly secured to prevent swaying and diagonal braces must be used to secure a completed scaffold.
 The Staff Hearing Officer rules that while the cited rules don't specifically state that these safety rules only apply to completed or finished scaffolds being used to build structures at construction sites, that it is obvious that these rules should only apply to already completed scaffolds so that employees working on them will be safe. To hold otherwise, that is, to find that these rules apply not only to already completed scaffolds, but also to scaffolds still being built would subject employers to safety standards that would be clearly premature because the required safety rules contemplate a review of existing and completed scaffolds to ensure that completed scaffolds meet pre-determined safety regulations.
 Therefore, it is found that 4123:1-3-10(C)(1)(11) and 4123:1-3-10(F)(1) do not apply to this fact pattern because a review of the transcript (pg. 5, 6, 41, 44, 49) reveals that the scaffold at issue was not completed, it was still being erected at the time of injury.
(Emphasis sic.) *Page 20 
 {¶ 30} 9. Relator moved for a rehearing under Ohio Adm. Code4121-3-20(C).
 {¶ 31} 10. On November 28, 2005, another SHO mailed an order denying relator's motion for rehearing:
 It is hereby ordered that the motion for rehearing filed 10/12/2005 be denied. The Injured Worker has not submitted any new and relevant evidence nor shown that the order of 07/21/2005 was based on an obvious mistake of fact or on a clear mistake of law.
 It is found that the requirements of O.A.C. 4121-3-20(C)(1)(b) have not been met, and that the request for a VSSR Rehearing must therefore be denied.
 {¶ 32} 11. On June 15, 2007, relator, John W. Johnson, filed this mandamus action.
Conclusions of Law: {¶ 33} The commission, through its SHO, held that the three specific safety rules relating to scaffolding apply only to "completed" or "finished" scaffolds, and because the scaffold at issue was undisputedly not completed immediately prior to the injury, the safety rules are inapplicable to the circumstances of this case and cannot be used to impose a VSSR penalty on Buckner.
 {¶ 34} The issue here is whether the commission abused its discretion in interpreting the three specific safety rules relating to scaffolding to be inapplicable to the circumstances of this case.
 {¶ 35} Finding that the commission did not abuse its discretion in interpreting the rules to be inapplicable, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 36} Ohio Adm. Code 4123:1-3 sets forth specific safety requirements relating to construction. *Page 21 
 {¶ 37} Ohio Adm. Code 4123:1-3-10 sets forth definitions and specific safety requirements relating to "scaffolding."
 {¶ 38} Two definitions are pertinent to the three safety rules at issue. Ohio Adm. Code 4123:1-3-10(B)(27) and (30) state:
 (27) "Platform" means the temporary flat working surface used to support employees, material, and equipment.
 (30) "Scaffold" means any temporary elevated platform and its supporting structure used for supporting employees, materials, or equipment.
 {¶ 39} Ohio Adm. Code 4123:1-3-10(C) is captioned "General requirements for all scaffolds." Thereunder are the following two specific safety requirements:
 (1) The footing or anchorage for scaffolds shall be sound, rigid, and capable of carrying four times the maximum rated load without settling or displacement. Unstable or loose objects shall not be used to support scaffolds.
 * * *
 (11) The poles, legs, or uprights of scaffolds shall be plumb and securely and rigidly braced to prevent swaying and displacement.
 {¶ 40} Ohio Adm. Code 4123:1-3-10(F) is captioned "Tubular welded frame scaffolds." Thereunder is the following specific safety requirement:
 (1) Scaffolds shall be properly braced by diagonal braces for securing vertical members together laterally, and the cross braces shall be of such length as will automatically square and align vertical members so that the erected scaffold is always plumb, square, and rigid. All brace connections shall be made secure.
 {¶ 41} To successfully assert a VSSR, a claimant must establish that his injury resulted from the employer's failure to comply with a specific safety requirement. State ex rel. Burton v. Indus. Comm.
(1989), 46 Ohio St.3d 170. *Page 22 
 {¶ 42} The commission "has the discretion to interpret its own rules; however, where the application of those rules to a unique factual situation gives rise to a patently illogical result, common sense should prevail." State ex rel. Lamp v. J.A. Croson Co. (1996),75 Ohio St.3d 77, 78-79, quoting State ex rel. Harris v. Indus. Comm. (1984),12 Ohio St.3d 152, 153. However, the commission has no authority to rewrite its safety rules under the guise of interpreting them. Lamp, at 81.
 {¶ 43} Moreover, because a VSSR award is a penalty, the rule of strict construction applies and all reasonable doubts concerning the interpretation of the safety rule must be resolved in the employer's favor. Burton, at 72, citing State ex rel. Watson v. Indus. Comm.
(1986), 29 Ohio App.3d 354; State ex rel. Martin Painting Coating Co.v. Indus. Comm. (1997), 78 Ohio St.3d 333, 342, citing Burton. It should be further noted that the rule of strict construction does not apply to resolving factual disputes. State ex rel. Supreme Bumpers v. Indus.Comm., 98 Ohio St.3d 134, 2002-Ohio-7089, at ¶ 70. It is a rule of statutory, not evidentiary, interpretation, devised only as a guide to interpreting the specific requirements of a safety standard in VSSR claims. Id.
 {¶ 44} As previously noted, following the July 21, 2005 hearing, the SHO issued an order finding that, after placing a plastic cover over the scaffold under construction, relator was told to put up "safety rails." Parenthetically, the magistrate notes that relator refers to the "safety rails" as "safety poles" during his testimony. The SHO further found that, as relator was trying to position a safety rail, a gust of wind caused the scaffold to collapse.
 {¶ 45} The SHO found that the three specific safety rules at issue apply only to "completed" scaffolds. Finding that the scaffold at issue was not completed, the SHO refused to apply the three safety rules. The SHO stated that applying the rules "to *Page 23 
scaffolds still being built would subject employers to safety standards that would be clearly premature."
 {¶ 46} Here, relator accurately points out that the three safety rules at issue do not contain language indicating that they are only applicable to "completed" scaffolds. On that basis, relator concludes that the commission, through its SHO, impermissibly inserted language into the rules and effectively rewrote the rules. Citing Lamp andHarris, relator claims that the commission's interpretation of the rules gives rise to an illogical result — permitting an employer to avoid the rules by simply alleging that the scaffold at issue was not yet finished or completed.
 {¶ 47} The magistrate disagrees with relator's argument that the commission effectively rewrote its rules or that its interpretation gives rise to an illogical result under the circumstances of this case.
 {¶ 48} Analysis begins with some observations regarding the undisputed facts of this case.
 {¶ 49} From the record, we cannot determine whether completion of the installation of the safety poles would have given the scaffold the added stability to withstand the force created by the wind gust upon the plastic cover. We do know, however, that the purpose of the attempted installation of the safety poles was to further stabilize the scaffold. We do know that relator was engaged in the installation of the very thing that might have prevented the scaffold's collapse. Thus, in a sense, that the scaffold structure had not yet been completed may have been a contributing cause of the scaffold's collapse — a contributing cause that could excuse the employer from liability under the safety rules at issue. *Page 24 
 {¶ 50} Given that there is no evidence to suggest that the safety poles would not have prevented the scaffold's collapse, in the magistrate's view, it was not an abuse of discretion for the commission to find the three safety rules to be inapplicable. This is so even though the scaffold at issue was being used as a scaffold within the definition set forth at Ohio Adm. Code 4123:1-3-10(B)(30) when relator was attempting to install the safety pole. That is, the uncompleted scaffold was being used as an elevated platform to support relator and the safety pole that was hoisted to him while he was engaged in building the scaffold to completion. See State ex rel. Cleveland Wrecking Co. v.Indus. Comm. (1988), 35 Ohio St.3d 248, 250 (the boom of a crane was held to be a scaffold).
 {¶ 51} Perhaps it can be said that the SHO's pronouncement that the safety rules apply only to "completed" scaffolds is overbroad and fails to accurately articulate the actual problem in applying the three safety rules to the undisputed facts of this case.
 {¶ 52} Given the above analysis, relator's argument that the SHO effectively rewrote the safety rules misses the mark. Even if it can be said that the three safety rules cannot be read as a matter of interpretation to be inapplicable to all scaffolds that are incomplete regardless of the circumstances of their incompletion, it is clear that the three safety rules can be read to be inapplicable to the scaffold at issue here because the scaffold collapsed while it was undergoing further stabilization by installation of the safety poles.
 {¶ 53} The commission's finding that the rules are inapplicable does not give rise to a patently illogical result as relator claims. There is no evidence that Buckner was attempting to avoid the applicability of the rules relating to scaffolding by deliberately delaying the completion of the scaffold. In fact, the undisputed evidence shows that *Page 25 
Buckner was endeavoring to complete or finish the erection of the scaffold at the time of the injury.
 {¶ 54} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 3