THE STATE EX REL. SUPREME BUMPERS, INC., APPELLANT, *v.* INDUSTRIAL

COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *State ex rel. Supreme Bumpers, Inc. v. Indus. Comm.,* 98 Ohio St.3d

134, 2002-Ohio-7089.]

*Workers' compensation — Claim allowed for death resulting from exposure to nickel and chrome dust in the workplace — Application filed by decedent's wife for additional compensation for violation of a specific safety requirement, IC-5-10-05(A) — Additional compensation awarded — Industrial Commission's order awarding claimant an additional award for a VSSR not an abuse of discretion when supported by evidence in the record.*

(No. 2001-1095 — Submitted September 17, 2002 — Decided December 24,

2002.)

APPEAL from the Court of Appeals for Franklin County, No. 00AP-778.

_____

**ALICE ROBIE RESNICK, J.**

{¶1} Franklin Robinson worked as a polisher for appellant Supreme Bumpers, Inc., intermittently from 1964 to 1980 and consistently from 1981 through 1996. As a polisher, Robinson was required to use a large polishing wheel to strip off the outer layer of chrome from old car bumpers and then buff and polish the underlying nickel base before the bumpers were replated.

{¶2} Robinson was forced to quit his job in late 1996, after being diagnosed with squamous cell carcinoma of the left maxillary sinus. He underwent radical maxillectomy followed by radiation and chemotherapy, but the cancer eventually metastasized, and Robinson died in January 1998.

**{¶3}** The decedent's wife, claimant-appellee Carrie Richardson, filed a workers' compensation claim for death benefits, alleging that the death of her husband resulted from workplace exposure to nickel and chrome dust. The claim was allowed.

**{¶4}** Richardson also filed an application for an additional award based on Supreme Bumpers' alleged violation of a specific safety requirement ("VSSR"). She claimed that her husband's death was due to Supreme Bumpers' failure to comply with Industrial Commission specific safety rules IC-5-10 and IC-5-11, which require employers to furnish adequate respiratory equipment or to utilize other equally effective methods to control an employee's exposure to harmful air contaminants.

**{¶5}** On February 5, 2000, a staff hearing officer ("SHO") for appellee Industrial Commission of Ohio determined that "the decedent's death was the result of a failure to supply an appropriate respiratory device or otherwise control air contaminants as required by IC-5-10.05(A) and IC-5-11.03." The SHO made the following findings: (1) that Robinson "was exposed to 'air contaminants,' as that term is defined in IC-5-11.02(A)," (2) that Robinson "was exposed to injurious concentrations of chrome and nickel dust," (3) that the application of IC-5-11 is not limited "to the few substances listed in the Appendix," i.e., Appendix I, Threshold Limit Values Table, (4) that although "[t]he employer did make available paper dust masks, * * * this 'respiratory equipment' was not sufficient or appropriate for the chrome and nickel dust the [decedent] was for years exposed to," and (5) that the various other methods allegedly utilized by the employer, such as a general ventilation system, local exhaust hoods on the polishing machines, and the application of a liquid glue to the buffing wheel, were ineffective in controlling exposure to the nickel and chrome dust that was generated in its polishing department. Accordingly, the SHO ordered that "an

additional award of compensation be granted to the spouse-claimant in an amount equal to 15 percent of the maximum weekly rate."

{¶6} After the Industrial Commission denied reconsideration, Supreme Bumpers filed an original action with the Franklin County Court of Appeals requesting a writ of mandamus. The matter was referred to a magistrate, who recommended that the appellate court issue a writ ordering the commission to vacate its VSSR award. According to the magistrate, "there is no evidence in the record to establish that relator either knew that chrome and nickel [were] 'toxic,' or that relator knew that there was an injurious concentration of nickel and chrome dust present in the workplace in excess of the limits which would not normally result in injury to an employee. * * * Furthermore, there is absolutely no evidence in the record establishing what the air quality was in the factory prior to the 1990's. As such, there is no evidence to support a finding that relator knew it was exposing its employees to injurious concentrations of nickel and chrome dust."

{¶7} In concluding that the commission abused its discretion in ordering an additional award, the magistrate found it necessary to keep "in mind that a VSSR is in the nature of a penalty to the employer subject to the rule of strict construction with all reasonable doubts concerning the interpretation of the safety standard to be construed against the applicability of the standard to the employer."

{¶8} On objection to the magistrate's decision, the court of appeals found it necessary to lay out substantial portions of the evidence upon which the commission relied "[i]n addition to the magistrate's findings of fact." In doing so, the court of appeals concluded that there is sufficient evidence in the record to support the commission's order finding a VSSR, particularly with regard to the employer's knowledge. Accordingly, the court sustained Richardson's objection

to the magistrate's decision and denied Supreme Bumpers' request for a writ of mandamus.

**{¶9}** The cause is now before this court upon an appeal as of right.

**{¶10}** There is no dispute that Robinson contracted an occupational disease and died as a result of being exposed to nickel and chrome dust in the course of and arising from his employment with Supreme Bumpers. The sole question for our review is whether the commission abused its discretion in finding that Supreme Bumpers failed to control that exposure as required by IC-5.

**{¶11}** As relevant here, IC-5, as effective January 1, 1967, provided:

**{¶12}** "IC-5-10

**{¶13}** "PERSONAL PROTECTIVE EQUIPMENT

**{¶14}** "IC-5-10.01 SCOPE

**{¶15}** "The requirements of this part of the code relate to the personal protective equipment listed immediately below as required for employees on operations described in IC-5-10, in which there is a known hazard, recognized as injurious to the health or safety of the employee.

**{¶16}** "(A) Eye protection

**{¶17}** "(B) Face shields

**{¶18}** "(C) Respirators and masks

**{¶19}** "(D) Helmets and hoods

**{¶20}** "(E) Gloves, Aprons and sleeves:

**{¶21}** "(1) Rubber or plastic, designed to afford protection from harmful chemicals,

**{¶22}** "(2) Electrician's rubber gloves.

**{¶23}** "* * *

**{¶24}** "IC-5-10.05 RESPIRATORY EQUIPMENT

**{¶25}** "(A) RESPONSIBILITY

**{¶26}** "The employer shall furnish respiratory equipment which has been approved by the U.S. Bureau of Mines [footnote omitted], where there are air contaminants, as defined in IC-5-11 of this code. It shall be the responsibility of the employee to use the respirator or respiratory equipment provided by the employer. See Sections 4101.12 R.C. and 4101.13 R.C.

**{¶27}** "This requirement does not apply where an effective exhaust system or other means of equal or greater protection has been provided.

**{¶28}** "Where there is a dust or mist not considered harmful, respirators should be available for employees who request them.

**{¶29}** "* * *

**{¶30}** "IC-5-11

**{¶31}** "VENTILATION AND EXHAUST EQUIPMENT

**{¶32}** "IC-5-11.01 SCOPE

**{¶33}** "IC-5-11 of this code relates to methods of controlling air contaminants (toxic gases, toxic dusts, toxic mists, toxic fumes and toxic vapors) named in this code and which have been established as injurious.

**{¶34}** "Appendix I, Threshold Limit Value Table and Appendix II, Examples of Local Exhaust Ventilation, are for information and guide purposes only and are not specific requirements of this code.

**{¶35}** "IC-5-11.02 definition

**{¶36}** "(A) **Air contaminants**, as used in this code mean injurious concentrations of fibrosis-producing or toxic dusts, toxic fumes, toxic mists, toxic vapors, or toxic gases or a combination of these, suspended in the atmosphere. (see IC-5-11.05(D)).

**{¶37}** "* * *

**{¶38}** "(K) **Injurious concentrations**, as applied to air contaminants, means concentrations which are known to the employer to be in excess of those

which would not normally result in injury to an employee's health if the employee had not been previously exposed to such air contaminants.

**{¶39}** "* * *

**{¶40}** "IC-5-11.03 CONTROL OF AIR CONTAMINANTS

**{¶41}** "(A) METHODS OF CONTROL

**{¶42}** "Air contaminants shall be minimized by one or more of the following methods:

**{¶43}** "* * *

**{¶44}** "(5) Remove by general ventilation,

**{¶45}** "(6) Use of wet methods to allay dusts." (Emphasis sic.)

**{¶46}** In order to be entitled to an additional award for a VSSR, the claimant must establish that an applicable and specific safety requirement existed at the relevant time, that the employer failed to comply with the requirement, and that the employer's noncompliance was a cause of the injury. See *State ex rel. Ohio Mushroom Co. v. Indus. Comm.* (1989), 47 Ohio St.3d 59, 547 N.E.2d 973; *State ex rel. Haines v. Indus. Comm.* (1972), 29 Ohio St.2d 15, 58 O.O.2d 70, 278 N.E.2d 24.

**{¶47}** Workers' compensation statutes are generally construed in favor of awarding compensation to injured employees and the dependents of deceased employees. R.C. 4123.95. But because a VSSR award is in the nature of a penalty to the employer, we have found that specific safety requirements "must be strictly construed, and all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer." *State ex rel. Burton v. Indus. Comm.* (1989), 46 Ohio St.3d 170, 172, 545 N.E.2d 1216. See, also, *State ex rel. Carder v. Indus. Comm.* (2002), 94 Ohio St.3d 165, 166-167, 761 N.E.2d 32. The application of the strict-construction rule cannot, however, justify an illogical result or one that is contrary to the clear intention of

6

the code.  *State ex rel. Maghie & Savage, Inc. v. Nobel* (1998), 81 Ohio St.3d 328, 331, 691 N.E.2d 277.

**{¶48}**  Supreme Bumpers initially claims that pursuant to IC-5-10 and IC-5-11, employers are not required to afford any protection against nickel and chrome dust.  In support, Supreme Bumpers relies on IC-5-11.01, which delimits the scope of IC-5-11.  According to Supreme Bumpers, this provision "defines air contaminants as those *named* in 'this code' and * * * Appendix I does *not* list chromium or nickel dust as contaminants."  (Emphasis sic.)

**{¶49}**  The flaw in this argument is immediately apparent.  Appendix I lists approximately 70 potentially harmful substances to which the requirements of IC-5-11 apply.  However, IC-5-11.01 contains an explicit disclaimer that certain appendices to the rule, including Appendix I, "are for information and guide purposes only and are not specific requirements of this code."  Thus, IC-5-11.01 cannot be interpreted as limiting the scope of IC-5-11 to those substances listed in Appendix I.

**{¶50}**  Nevertheless, the argument continues, IC-5-11 still applies "only to contaminants *named* in the Code.  (IC-5-11.01).  Neither nickel nor chrome dust [is] listed in Appendix I *or in any other portion of the Code*.  As a result, they *are not* air contaminants for purposes of imputing liability to an employer under IC-5."  (Emphasis sic.)

**{¶51}**  There is, of course, a certain inherent inconsistency in these two aspects of Supreme Bumpers' no-coverage argument.  In arguing that nickel dust and chrome dust are excluded from the scope of the rule because they are not listed in Appendix I, Supreme Bumpers necessarily assumes that this appendix is where contaminants "named in this code" are intended to be cataloged.  In other words, a contaminant must be listed in Appendix I to be considered a named contaminant for purposes of coverage under IC-5-11.01.  But when faced with the

disclaimer in IC-5-11.01, Supreme Bumpers then agrees that Appendix I "is not a limitation upon the various air contaminants covered by IC-5-11."

**{¶52}** In any event, we find that the commission reasonably interpreted its own rules in this case. IC-5-10 and IC-5-11 are clearly designed to protect Ohio employees against the known harmful effects of industrial air contaminants, including fibrosis-producing or toxic dusts. The commission attempted to enumerate contaminants known to be potentially injurious in Appendix I, but disclaimed any intent to make this an exhaustive list. It would be patently illogical for us to assume that the code's drafters intended Ohio employees to run the risk of being injured or killed by some fibrosis-producing or toxic dusts but not by others. There is certainly nothing to suggest that the authors meant to create a gap in which an employer, knowing full well that its employees are being exposed to harmful air contaminants, can nevertheless sit idly by, refuse to provide any form of protection, and yet rest comfortably under the supposed shelter given to unnamed substances.

**{¶53}** In *Nobel*, we explained that "the commission 'has the discretion to interpret its own rules; however, where the application of those rules to a unique factual situation gives rise to a patently illogical result, common sense should prevail.' " Id., 81 Ohio St.3d at 331, 691 N.E.2d 277, quoting *State ex rel. Harris v. Indus. Comm.* (1984), 12 Ohio St.3d 152, 153, 12 OBR 223, 465 N.E.2d 1286. Surely we cannot insist that the commission interpret its own rules so as to *achieve* an illogical result.

**{¶54}** Supreme Bumpers' second and primary claim is that "the magistrate properly concluded that the Industrial Commission abused its discretion in the absence of any evidence that Appellant knew of injurious concentrations of toxic [dusts]." As did the court of appeals, we too find it necessary to set forth the evidence in some detail.

{¶55} Larry Curl was employed at Supreme Bumpers, Inc., from April 1987 to February 1997. For approximately six years of that time, he worked as an inspector in the polishing department where decedent Franklin Robinson worked. In his affidavit, Curl stated:

{¶56} "During the time I worked in the polishing department, the conditions were extremely dusty from the dust coming off the chrome bumpers at the polishing machines. The ventilation units at the polishing machines did not work effectively, and dust would escape all over the shop. The polishers would be covered, head to toe, with polishing dust. The dust would get in the polishers' hair, on their clothes, and cover their faces.

{¶57} "In my opinion, * * * [t]he exhaust systems on the polishing machines * * * were never effective in removing the bulk of the dust from the bumpers for any lasting period of time."

{¶58} Willie Broughton was a coworker of decedent during the mid-1960s. In his affidavit, Broughton stated:

{¶59} "The company did not provide any safety training * * * [or] any type of respiratory masks to polishers during the time I was employed there. I recall seeing Franklin Robinson covered with dust off the polishing wheel, from head to toe, on several occasions while I worked at the company.

{¶60} "Working as a polisher at Supreme Bumpers, we were constantly exposed to the dust that was coming off the polishing wheel. Our shifts lasted 8 to 10 hours and at the end of the shift there would be a considerable amount of dust all over the shop and on the floor that would have to be swept up. Dust from the polishing process generally covered all the objects in the shop, including the polishers. The polishers would have dust all over their clothes, in their hair, in their ears and noses. I would have to blow my nose and dust would come out.

**{¶61}** "There were exhaust hoods on the polishing machines but they were never effective in significantly reducing the amount of dust that would escape. They would often plug up. Even when they were working, the amount of dust was excessive and would still cover everything in the shop. Very often, windows and doors would be opened to try to reduce the amount of the dust in the shop, but that would not work effectively either."

**{¶62}** In a report dated March 4, 1997, decedent's treating physician, Michael A. Yanik, M.D., opined that Robinson's squamous cell carcinoma of the left maxillary sinus was work-related. Dr. Yanik explained, "These carcinomas have been directly linked to specific occupations notably individuals who had chrome and nickel exposure for several years. * * * It is truly one of the few actual disease processes * * * that are directly related to a specific work place hazard. This is well documented in all of the occupational health textbooks as well as standard surgical textbooks." Dr. Yanik also stated that at the time of Robinson's orbital exenteration and maxillectomy, "the specimen was literally glistening with fine metallic particles." Indeed, the specimen was so "interesting," as Dr. Yanik put it, that he felt compelled to note in his report that during the surgery "several physicians from other rooms as well as several of the operating room nurses came in to look at the fine metallic particles on the carcinoma."

**{¶63}** In a report dated June 23, 1997, Michael K. Riethmiller, M.D., J.D., who performed a medical evaluation of Robinson at the request of the employer's attorney, also concluded, "Mr. Robinson's development of a left maxillary squamous cell carcinoma was directly caused by his work place exposure to nickel and chromium dust over a number of years. It is well known that these metals can cause mucous membrane changes which lead to squamous cell carcinoma."

**{¶64}** Nevertheless, the magistrate concluded that "there is no evidence to support a finding that [Supreme Bumpers] knew it was exposing its employees to injurious concentrations of nickel and chrome dust." In defending this conclusion, Supreme Bumpers points to two pieces of evidence cited by the court of appeals as relevant to the issue of the employer's knowledge and argues that neither of these evidentiary items is capable of bearing the weight that the appellate court would have it support. Thus, Supreme Bumpers argues that (1) "the use of an exhaust system does not establish that deceden[t] was exposed to a known hazard" because "[e]xhaust systems are frequently installed for a variety of reasons having nothing to do with injurious concentrations of toxic dust," and (2) although "Dr. Riethmiller opined in 1997 that it *is* well known that nickel and chrome dust can lead to cancer * * *, [this] determination almost one year subsequent to decedent's employment does not establish that Appellant knew prior to that time that nickel and chrome dust were toxic or that injurious concentrations occurred in the plant during decedent's employment." (Emphasis sic.)

**{¶65}** The obvious and overriding deficiency in this analysis lies in its failure to account for the *totality* of the evidence in this case. The record in this case, when reviewed in its entirety, does not merely suggest the "use of an exhaust system" in the plant, but reveals that the employer took several measures in an effort to reduce the level of, and exposure to, airborne dust generated by the polishing machines. Indeed, Supreme Bumpers refers to evidence that "paper-type masks were supplied" to the polishers and, in a subsequent proposition of law, argues that "the buffing wheels at which decedent work[ed] were covered with a 'liquid' glue which controlled airborne dust." The SHO found that in addition to general ventilation methods, "these polisher/buffer machines were equipped with a local exhaust hood and duct work to remove dust created in the

polishing process. * * * However, * * * this exhaust hood on the polisher/buffer often did not work and did not remove the dust at its source the way it was supposed to." The affidavits of Curl and Broughton also describe the exhaust hoods as being "on the polishing machines." And Supreme Bumpers, again in a subsequent proposition of law, argues that it did in fact "provide ventilation and exhaust equipment as required by IC-5-11," and that these devices effectively "reduced the exposure of employees to that below the permissible exposure limits" for nickel and chrome dusts.

{¶66} Although Supreme Bumpers suggests that employers often install exhaust systems for reasons other than to minimize toxicity levels of airborne dust, it does not reveal what those other reasons might be, and it never actually claims that its exhaust system was installed for any particular purpose or purposes unrelated to the ambient concentration level of toxic dusts that were being generated by the polishing machines. When we consider all of the measures taken in this case, it becomes obvious that Supreme Bumpers is urging us to speculate that it might have had other considerations in mind. The furnishing of paper masks hardly serves any such hypothetical purpose as avoiding product contamination, good housekeeping, or general maintenance; and the application of liquid glue to the polishing wheels, coupled with the fact that exhaust hoods and ductwork were installed on or with reference to the polishing machines themselves, indicates that Supreme Bumpers was attempting to filter out the very contaminants at issue. In any event, it is certainly reasonable for the SHO, as factfinder, to infer from the use of these various methods that Supreme Bumpers knew its employees were being exposed to injurious concentrations of nickel and chrome dust.

{¶67} Contrary to the magistrate's findings, IC-5-10 and IC-5-11 do not require that the employer have specific knowledge that "there was an injurious

concentration of nickel and chrome dust present in the workplace in excess of *the limits* which would not normally result in injury to an employee." (Emphasis added.) Because the threshold limit value table in Appendix I to these rules is "for information and guide purposes only," IC-5-11.01, the claimant need not establish that the employer had actual or constructive scientific knowledge that the particular concentration of the relevant contaminant was so many parts per million in excess of the daily limit values. Instead, it is sufficient that the employer knew the concentrations "to be in excess of those which would not normally result in injury to an employee's health if the employee had not been previously exposed to such air contaminants." IC-5-11.02(K).

{¶68} Similarly, Dr. Riethmiller's report is not the only evidence that these metals are "well known" to cause squamous cell carcinoma. Dr. Yanik reported that the direct link between squamous cell carcinoma and "several years" of exposure to nickel and chrome dust "is well documented in all of the occupational health textbooks as well as standard surgical textbooks." In evaluating the sufficiency of this evidence, we must therefore consider that it takes "several years" of exposure to nickel and chrome dust for any individual to contract squamous cell carcinoma, that it took 30 years for any symptomatology to become manifest in Robinson's case, and that by March 1997, the date of Dr. Yanik's report, the direct link between these carcinomas and exposure to nickel and chrome was already so "well known" and so "well documented" that the fact appears "in all of the occupational health * * * [and] standard surgical textbooks." With these considerations in mind, we cannot reasonably conclude, as a matter of law, that these reports have no evidentiary value in determining the question of the employer's knowledge "prior to that time" or "during the time of decedent's employment."

**{¶69}** Moreover, it would not be appropriate for us to analyze these two pieces of evidence in isolation and insist that one of them must alone sustain the claimant's burden of proving knowledge. This court has never required direct evidence of a VSSR. To the contrary, in determining the merits of a VSSR claim, the commission or its SHO, like any factfinder in any administrative, civil, or criminal proceeding, may draw reasonable inferences and rely on his or her own common sense in evaluating the evidence. See, e.g., *State ex rel. Burton*, supra, 46 Ohio St.3d at 172, 545 N.E.2d 1216. In fact, we have been critical of the commission where, en route to a factual determination, it separately examined individual evidentiary items without ever considering the combined or cumulative effect of the evidence as a whole. See *State ex rel. Hayes v. Indus. Comm.* (1997), 78 Ohio St.3d 572, 679 N.E.2d 295.

**{¶70}** Nor does the rule requiring strict construction of VSSR awards apply here. The issue of the employer's knowledge in this case is a factual question, and the strict-construction rule does not apply in resolving factual disputes. It is a rule of statutory, not evidentiary, interpretation, devised only as a guide to interpreting the specific requirements of a safety standard in VSSR claims. See, e.g., *Nobel,* supra, 81 Ohio St.3d at 330, 691 N.E.2d 277 ("Strict construction and requirement specificity are primarily rules of interpretation. The problem in this case, however, is more of application than interpretation."). It permits neither the commission nor a reviewing court to construe the *evidence* of a VSSR strictly in the employer's favor.

**{¶71}** The question of the employer's knowledge in this case is therefore governed by the same adjective principles that govern questions of fact in all workers' compensation cases: the claimant has the burden of proving a VSSR by a preponderance of the evidence, the commission alone is responsible for evaluating the weight and credibility of the evidence, and this or any other

reviewing court may not reweigh the evidence, but must instead uphold the commission's decision so long as it is supported by "some evidence." See *Burton*, 46 Ohio St.3d at 171, 172, 545 N.E.2d 1216; *State ex rel. Am. Home Prod. Corp. v. Indus. Comm.* (1988), 39 Ohio St.3d 317, 318, 530 N.E.2d 873; *State ex rel. Pre Finish Metals, Inc. v. Indus. Comm.* (1988), 39 Ohio St.3d 314, 316, 530 N.E.2d 918.

{¶72} Thus, the evidence of an exhaust system and Dr. Riethmiller's statement must not only be considered together, but must also be evaluated in conjunction with all of the evidence upon which the SHO relied, including that Robinson's carcinoma "was literally glistening with fine metallic particles," that nickel and chrome dust permeated the polishing area, covered the polishers from head to toe for eight to ten hours a day, and penetrated their nostrils, that there was a documented direct link between squamous cell carcinoma and years of exposure to nickel and chrome dust, and that both Supreme Bumpers and its employees took various measures to reduce exposure to these air contaminants.

{¶73} Considering the entire record in this case, we conclude that the totality of the evidence is more than sufficient to support a finding that Supreme Bumpers knew that the concentrations of nickel and chrome dust existing in its polishing department were "in excess of those which would not normally result in injury to an employee's health."

{¶74} Finally, Supreme Bumpers proposes that an employer may not be held liable under IC-5-10 and IC-5-11 where it utilizes an effective exhaust system or a "wet method" to minimize air contaminants. Supreme Bumpers then argues that it did in fact "provide ventilation and exhaust equipment as required by IC-5-11," as well as "apply a liquid substance to the polishing wheels." Further, with regard to the liquid glue, Supreme Bumpers contends that while "[t]he Industrial Commission found that this was 'not a true "wet method"

envisioned by IC-5-11.03(A)(6)[,]' [t]his determination was made without explanation or description of the evidence relied upon." Thus, the commission should be ordered to provide "further hearing or clarification setting forth the basis of its decisio[n] as required by *State ex rel. Mitchell v. Robbins & Myers, Inc.* (1983), 6 Ohio St.3d 481 [6 OBR 531, 453 N.E.2d 721]."

**{¶75}** We agree that these sections of the code permit an employer to use general ventilation or a wet method instead of respiratory equipment, that is, so long as these alternative methods are "effective" and provide "equal or greater protection." IC-5-10.05(A). See, also, IC-5-11.03(A)(5) and (6). However, the SHO specifically found that the ventilation units utilized by Supreme Bumpers were ineffective. With regard to the application of liquid glue to the polishing wheels, the SHO did not simply opine that "this is not a true 'wet method,' " but went on to explain that "[t]his latter finding encompasses the additional finding that none of the six 'methods of control' specified in IC-5-11.03(A) effectively minimized the air contaminants."

**{¶76}** There may be some limited truth to Supreme Bumpers' observation that evidence of dust is not necessarily synonymous with evidence of hazardous air contaminants. But considering all of the evidence going to the excessively dusty conditions at the plant, including Curl's opinion that the ventilation units did not work effectively, Broughton's statement that he and others "were constantly exposed to the dust that was coming off the polishing wheel," and the undisputed fact that decedent's carcinoma "was literally glistening with fine metallic particles," it cannot be said that the commission's findings with regard to the effectiveness of these proffered alternative methods were devoid of evidentiary support.

**{¶77}** Based on all of the foregoing, we hold that the commission did not abuse its discretion in awarding claimant an additional award for a VSSR.

Accordingly, the judgment of the court of appeals denying Supreme Bumpers a writ of mandamus is hereby affirmed.

Judgment affirmed.

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs in judgment only.

_____

**COOK, J., concurring in judgment only.**

{¶78} Because the commission acted within its discretion in determining that this employer violated a specific safety requirement, I concur with the decision to affirm the judgment of the court of appeals.

_____

Eastman & Smith, Ltd., John T. Landwehr and Katharine T. Talbott, for appellant.

Betty D. Montgomery, Attorney General, and William J. McDonald, Assistant Attorney General, for appellee Industrial Commission.

John R. Polofka and Trevor P. Van Berkam, for appellee Carrie Richardson.

_____