[Cite as *State ex rel. Mike Coates Constr. Inc. v. Indus. Comm.*, 2017-Ohio-718.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Mike Coates Construction, Inc.,:

      Relator,              :

v.                           :           No. 16AP-114

The Industrial Commission of Ohio   :       (REGULAR CALENDAR)
and James E. Van Buskirk, Jr.,

                           :

      Respondents.           :

---

D E C I S I O N

Rendered on February 28, 2017

---

**On brief:** *Calfee, Halter & Griswold LLP*, and *Donald E. Lampert,* for relator.

**On brief:** *Michael DeWine*, Attorney General, and *Cheryl J. Nester,* for respondent Industrial Commission of Ohio.

---

IN MANDAMUS
ON OBJECTION TO THE MAGISTRATE'S DECISION

DORRIAN, J.

{¶ 1} Relator, Mike Coates Construction, Inc., requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate the November 2, 2015 order of its staff hearing officer ("SHO") that denies relator's July 23, 2015 motion requesting the commission exercise its continuing jurisdiction over the September 25, 2002 order of the Ohio Bureau of Workers' Compensation that initially allowed the industrial claim of respondent James E. Van Buskirk, Jr., ("claimant") for lumbosacral sprain. Relator requests this court order the commission to enter an order that disallows the entire industrial claim on grounds that the industrial claim was fraudulently obtained based on an alleged September 3, 2002 injury.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto. The magistrate recommends this court deny relator's request for a writ of mandamus.

{¶ 3} Relator has filed the following objection to the magistrate's decision:

> The Magistrate erred when he implied that [the] fact-finders' drawing of inferences relying upon their own common sense is limitless, rejecting Relator's request that the Industrial Commission exercise its Continuing Jurisdiction pursuant to Revised Code 4123.52 and hold a Hearing on Allowance of Workers' Compensation Claim 02-425333.

{¶ 4} Relator requests a writ requiring the commission to exercise its continuing jurisdiction, pursuant to R.C. 4123.52, and to hold a hearing so that "facts may be found and evaluated as to whether [claimant] was indeed hurt at work or made up the alleged incident of September 3, 2002 as an initial means to perpetrate his fraud." (Relator's Objection at 2.) Relator argues that because claimant was found to have engaged in fraud related to his continuing receipt of temporary total disability compensation, the commission should hold a hearing to determine if claimant was actually injured at work in the first place. Relator contends that in finding the commission's rejection of relator's allegations to be appropriate, the magistrate implied that the commission's reliance on common sense is limitless. Finally, relator argues that the magistrate construed its argument incorrectly and clarifies that it was not arguing that it "must" be inferred but rather that it "should" be inferred from the February 21, 2014 Special Investigations Department report, and the May 8, 2014 district hearing officer's order that the September 25, 2002 claim allowance was also fraudulently obtained.

{¶ 5} Relator points to *State ex rel. Supreme Bumpers, Inc. v. Indus. Comm.*, 98 Ohio St.3d 134, 2002-Ohio-7089, in support of its arguments. In *Supreme Bumpers*, the Supreme Court of Ohio stated that "in determining the merits of a [violation of a specific safety requirement] claim, the commission or its SHO, like any factfinder in any administrative, civil or criminal proceeding may draw *reasonable* inferences and rely on his or her own common sense in evaluating the evidence." (Emphasis added.) *Id.* at ¶ 69. We disagree with relator that the magistrate implied that the commission may rely, without limit, on common sense. To the contrary, in citing *Supreme Bumpers*, the

magistrate used the term "reasonable"— which in and of itself constitutes a limit on the reliance on common sense. Furthermore, even if the magistrate misconstrued relator's argument that it "must" be inferred that the claim allowance was fraudulently obtained, the magistrate analyzed the SHO's determination by conducting an examination of the Anthony Bush, Adam Bush, and Mike Labey, Jr. affidavits and considered their similar statements as well as the length of time between the injury and the execution of the affidavits. Having considered the affidavits, we agree with the magistrate's determination that it was clearly within the fact-finding discretion of the SHO to reject them and to reject relator's inference that the injury itself was fraudulent.

{¶ 6}   On review of the magistrate's decision, an independent review of the record, and due consideration of relator's objection, we find the magistrate has properly determined the pertinent facts and applied the appropriate law. We therefore overrule relator's objection to the magistrate's decision and adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. Accordingly, relator's request for a writ of mandamus is hereby denied.

*Objection overruled;*
*writ of mandamus denied.*

SADLER and LUPER SCHUSTER, JJ., concur.

———————————

# APPENDIX

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

State ex rel.                                                          :
Mike Coates Construction, Inc.,

                                                                      :

       Relator,

                                                                      :

v.                                                                         No.  16AP-114

                                                                      :

The Industrial Commission of Ohio                                (REGULAR CALENDAR)
and                                                                   :
James E. Van Buskirk, Jr.,

                                                                      :

       Respondents.

                                                                      :

---

### MAGISTRATE'S DECISION

### Rendered on October 19, 2016

---

*Calfee, Halter & Griswold LLP,* and *Donald E. Lampert,* for relator.

*Michael DeWine,* Attorney General, and *Cheryl J. Nester,* for respondent Industrial Commission of Ohio.

---

### IN MANDAMUS

{¶ 7}   In this original action, relator, Mike Coates Construction, Inc. ("Coates" or "relator"), requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate the November 2, 2015 order of its staff hearing officer ("SHO") that denies relator's July 23, 2015 motion that the commission exercise its continuing jurisdiction over the September 25, 2002 order of the Ohio Bureau of Workers' Compensation ("bureau") that initially allowed the industrial claim for lumbosacral sprain, and to enter an order that disallows the entire industrial claim on

grounds that allegedly the industrial claim was fraudulently obtained based on an alleged September 3, 2002 injury.

Findings of Fact:

{¶ 8}  1. On September 4, 2002, James E. Van Buskirk, Jr., initially sought treatment from Edmund Csernyik, D.O., regarding a back injury that had allegedly occurred the day before, i.e., on September 3, 2002.  Dr. Csernyik practices at Falls Family Practice, Inc.

{¶ 9}  2.  The September 4, 2002 office note of Dr. Csernyik states:

> Comes in for treatment of a new Workman's Compensation Injury. Yesterday on 9/3/02 at approximately 11 AM, he was bending down to pick up a concrete form for a concrete wall. His left leg buckled, and he had a sharp pull and a burning sensation in his lumbosacral area and down into his left leg. He is still very uncomfortable in this area today with some left sided pain. Also woke up this morning with left cervical dorsal spasm and pain probably from sleeping in the wrong position trying to make the left leg comfortable.
>
> Lumbosacral area exhibits spasm, pain on palpation and decreased range of motion. He does have some significant sciatic nerve irritation which gives him discomfort and parethesias down into the foot. There was no acute trauma other than the strain. I don't think x-rays are indicated at this time.
>
> P: [One] We are going to treat this as an acute lumbosacral strain and sprain. He's much too sore for any manipulative therapy at this time. We are just going to have him use some heat at home.
>
> [Two] Put him on Skelaxin, 400-mg (#60) 1 t.i.d. with a refill.
>
> [Three] Ibuprofen, 800-mg (#60) 1 t.i.d. with a refill.
>
> [Four] We got him some Vicodin ES, (#50) 1 q8h prn with no refills.
> [Five] Got him Depo-Medrol, 80-mg IM.
>
> [Six] Next appointment five days.

{¶ 10} 3. On September 9, 2002, Van Buskirk returned to Dr. Csernyik. In his September 9, 2002 office note, Dr. Csernyik wrote:

> In complaining of continued L/S pain from Workman's Comp injury. His upper body resolved which I think was just from sleeping in an awkward positon.
>
> The lumbosacral area is slightly improved. There is still a lot of pain on palpation, spasm and decreased range of motion.
>
> A: [One] L/S strain and sprain.
>
> P: [One] We injected trigger areas in the right lumbosacral region with Marcaine and Depo-Medrol.
>
> [Two] We are going to see him again in a week.
>
> [Three] He continues off work and on same medications.
>
> [Four] Commented about the Vicodin making him a little nauseated and causing constipation. I told him all narcotics would tend to do this, and he should use it very sparingly.

{¶ 11} 4. On September 13, 2002, Van Buskirk filed a bureau form captioned "First Report of Injury, Occupational Disease or Death," which the bureau designates as the FROI-1.

{¶ 12} Under "Description of Accident," Van Buskirk wrote: "Stripping form off concrete wall hurt lower back down into left leg. Upper shoulder left side."

{¶ 13} On the portion of the form to be completed by the attending physician, Dr. Csernyik certified a diagnosis of lumbosacral strain and sprain.

{¶ 14} On the portion of the form to be completed by the employer, the form presents the employer a choice to mark one of two boxes regarding certification or rejection of the claim. Coates failed to mark either box.

{¶ 15} 5. The record contains a form letter dated September 16, 2002 from the bureau to relator. The letter asks the employer to either certify or reject the claim by completing the form.

{¶ 16} In the spaces provided, the employer is identified as "Mike Coates Construction Co., Inc." and the title of the person completing the form is identified as "Joanne Coates, Secretary." "Certification" rather than "Rejection" is selected by a mark

placed aside "Certification," and "9/27/02" is entered in the space provided aside the "Date."  However, in the space provided for "Employer's Signature" no signature is entered.

{¶ 17} 6. On September 25, 2002, the bureau mailed an order allowing the claim for "sprain lumbosacral" based on a "[m]edical report from Dr. Csernyik."  The bureau order also awarded temporary total disability ("TTD") compensation beginning September 5, 2002.  The bureau order advises:  "THIS DECISION BECOMES FINAL IF A WRITTEN APPEAL IS NOT RECEIVED WITHIN 14 DAYS OF RECEIVING THIS NOTICE."  (Emphasis sic.)

{¶ 18} 7. Relator did not administratively appeal the bureau's order of September 25, 2002.

{¶ 19} 8. On November 20, 2002, Van Buskirk was examined by Douglas H. Musser, D.O., on referral from Dr. Csernyik.  In his three-page narrative report, Dr. Musser opines:

> **X-RAY EXAMINATION:** Plain x-rays were reviewed today that demonstrate the patient to have marked degenerative changes noted at the lumbar spine which is significant at the L3-4, L4-5, L5-S1 levels with the L5-S1 level being severe. He does have a retrolisthesis which does increase 2mm in hyperextension to a Grade I. There is stenosis noted at this level. He has some mild degenerative spondylitic changes noted in his lumbar spine.
>
> MRI was reviewed today which demonstrated the patient to have marked degenerative changes noted of the lumbar spine at L3-4, L4-5, L5-S1. He has a herniated disc at these associated levels at L3-4, L4-5, L5-S1 with the worse levels at the L4-5 and the next level being the L5-S1 level. He has noted spinal stenosis at these associated levels.
>
> * * *
>
> **IMPRESSION/DIAGNOSIS:**
> [One] Herniated nucleus pulposis at the L3-4, L4-5, L5-S1.
>
> [Two] Spinal stenosis L3-4, L4-5, L5-S1.
>
> [Three] Retrolisthesis at L4-5 Grade I approximately 5mm to 6mm.

[Four] Retrolisthesis at L3-4 which is approximately 2mm to 3mm. There is spinal stenosis at the L3-4, L4-5, L5-S1 levels.

[Five] Radiculopathy L3-L4, L4-L5, L5-S1 dermatomal patterns.

**RECOMMENDATION:** Based on the patient's examination and films I do think that the patient sustained an injury at work that did cause him to herniate these discs. He describes his pain with marked radiculopathy that he did not have before. He describes an appropriate history for a herniated disc and examination demonstrates him to have tension signs suggestive of this. Currently, I think that also he may have had the degenerative changes of his lumbar spine but these are definitely aggravated by his current injury and caused these herniations.

{¶ 20} 9. Based on Dr. Musser's November 20, 2002 report, Van Buskirk moved for the allowance of additional conditions in the claim.

{¶ 21} 10. Following a March 6, 2003 hearing, an SHO additionally allowed the claim for "aggravation of spinal stenosis at L3-S1, aggravation of lumbar degenerative disc disease, radiculopathy L3-S1, herniated discs at L3-5, L4-5, and L5-S1." The SHO also awarded TTD compensation beginning November 20, 2002 based on a C-84 from Dr. Musser.

{¶ 22} 11. In May 2007, the industrial claim was additionally allowed for a major depressive disorder, single episode.

{¶ 23} 12. In February 2008, the industrial claim was additionally allowed for lumbar post laminectomy syndrome.

{¶ 24} 13. On March 14, 2011, the bureau's Special Investigations Department ("SID") received information from a confidential source who stated that Van Buskirk worked on numerous construction jobs in Galveston, Texas after the area had been hit by Hurricane Ike in 2009. Also, the source stated that Van Buskirk had been operating his own construction company which was called S & J Construction since at least 2002. The source further stated that Van Buskirk had completed numerous home improvement projects in the greater Akron area for the past decade.

{¶ 25} 14. Following a lengthy investigation, SID issued a 66-page report on February 21, 2014. The report provides the following summary:

A confidential source contacted the BWC Special Investigations Department (SID) and stated James VanBuskirk (VANBUSKIRK) was working in a self-employed capacity as a construction laborer. According to the source, VANBUSKIRK was operating his own business called S&J Construction. The SID coordinated a joint investigation with the Social Security Administration/Office of Inspector General (SSA/OIG) as VANBUSKIRK was also receiving disability benefits from the Social Security Administration.

The investigation revealed VANBUSKIRK had been working from the initial onset of his disability in November 2002 up until the present time. VANBUSKIRK continued to work in the construction field which was the exact same type of work he was doing when he was originally injured on 9/3/2002. VANBUSKIRK continued to work for the past 11 plus years as a "carpenter/laborer." Bank records were obtained from VANBUSKIRK'S accounts at PNC Bank (previously known as National City Bank) which revealed a voluminous amount of cash deposits being made into the account as well as a substantial amount of checks from potential customers.

An extensive amount of interviews were completed with customers who identified VANBUSKIRK as the individual they had hired to make various home improvement repairs. The customers provided copies of invoices and estimates VANBUSKIRK had given them. Others had his business card, flyers that he had placed in mailboxes offering his services, photos of VANBUSKIRK making the repairs, etc. Numerous court records were obtained in which VANBUSKIRK was either sued for faulty work by his customer or VANBUSKIRK was suing for non-payment for the work he performed. A copy of a transcript was obtained from one civil case in which VANBUSKIRK testified under oath regarding the construction work he performed on a new home.

Furthermore, the SID conducted several surveillances which yielded an extensive amount of video obtained of VANBUSKIRK working on various construction job sites. VANBUSKIRK was observed performing physical and strenuous labor tasks that included construction repairs such as installing new siding, roofing, windows, etc. Numerous wholesale and retail suppliers were subpoenaed and they provided documentation of materials and supplies that VANBUSKIRK had purchased over the years dating back to 2002.

VANBUSKIRK made numerous attempts to conceal his work activities by requesting that he be paid in cash from many customers. Additionally, VANBUSKIRK was hired as a "subcontractor" on some construction projects. Some contractors required his Social Security number so that a 1099 could legally be issued to him. In these instances, VANBUSKIRK would provide his wife's Social Security number so the wages would not be reported for him. Additionally, for many of the customers who wrote VANBUSKIRK a check, he did not always deposit the check into his own personal bank account. Instead, he would travel to the bank where the check was drawn from and would cash it there. VANBUSKIRK would then take the cash and deposit it into his own personal bank account. VANBUSKIRK would do this to avoid the customer's check showing up in his own bank records.

VANBUSKIRK was eventually located and interviewed by the SID and the SSA/OIG. He was interviewed on a job site where he was observed working on a new roof at a customer's residence in Akron, Ohio. VANBUSKIRK was less than truthful during the interview. VANBUSKIRK provided different answers regarding when he actually returned to work. VANBUSKIRK admitted and understood that he was not permitted to work while receiving disability benefits. VANBUSKIRK admitted that he failed to notify the BWC or the SSA about his employment status.

{¶ 26} 15. On February 26, 2014, citing the SID report, the bureau moved as follows:

This C-86 Motion respectfully requests the adjudication of the following issues in claim 02-425333 as evidence gathered as a result of an investigation performed by the Region One Special Investigations Unit supports the following:

**[One] The Special Investigations Unit requests the declaration of an overpayment relative to all Temporary Total Disability benefits (TT) paid from 11/20/02 through the present.**

As a result of the investigation completed by the Region One Special Investigations Unit (SIU) it was found James VanBuskirk returned to work as a "carpenter/laborer" (same

occupation at the time of injury) while receiving Temporary Total Disability benefits (TT).

**[Two] The Special Investigations Unit requests Temporary Total Disability benefits (TT) be terminated effective 11/20/02 the return to work date.**

Information obtained during the course of the investigation verified James VanBuskirk continued to work as a "carpenter/laborer" from 11/20/02 (first date he received TT) through the present while receiving Temporary Total Disability benefits (TT).

**[Three] The Special Investigations Unit asks the Ohio Industrial Commission to issue a finding of Fraud relative to any overpayment declared for Temporary Total Disability benefits (TT) paid from 11/20/02 through the present.**

Information obtained during the course of the investigation verified James VanBuskirk intentionally concealed his employment as a "carpenter/laborer" (same occupation at the time of injury) from the Bureau of Workers' Compensation in order to receive benefits to which he would not otherwise be entitled. The Special Investigations Unit requests a finding of Fraud so that any overpayment declared may be collected pursuant to the provisions of Ohio Revised Code 4123.511(K). Evidence to support the prima facie elements of Fraud will be presented at the time of hearing.

(Emphasis sic.)

{¶ 27} 16. Following a May 8, 2014 hearing, a district hearing officer ("DHO") mailed an order on May 13, 2014 declaring an overpayment of all TTD compensation paid to Van Buskirk from November 20, 2002 through the hearing date, and finding that the compensation was fraudulently obtained.

The DHO order of May 8, 2014 explains:

It is the finding of this Hearing Officer that the Injured Worker has committed fraud as a result of him engaging in work inconsistent with the concept and rules of temporary total disability compensation for the period commencing a short time after the date of injury in this claim which was 09/03/2002. The Bureau of Workers' Compensation has sustained their burden of proof by a preponderance of the

evidence that this Injured Worker knowingly used deception in different ways as set forth below to obtain temporary total disability compensation benefits during periods for which he was employed. The Bureau of Workers' Compensation has established the required mandatory prima facie elements of fraud: 1) a representation or where there is a duty to disclose, or concealment of facts; 2) which is material to the transaction at hand; 3) made falsely, with the knowledge of its falsity; 4) with the intent of misleading the Bureau of Workers' Compensation into relying upon it; 5) justifiable reliance upon the representation or concealment; and 6) a resulting injury approximately [sic] caused by the reliance.

It is ordered pursuant to Revised Code Section 4123.52 that this Injured Worker is overpaid temporary total disability compensation for the entire period from 11/20/2002 through 05/08/2014. Further, temporary total disability compensation shall be terminated effective the date of today's hearing. For each of the years from 2002 through 2013 this file contains evidence of material purchases, individual job and home improvement arrangements with various home owners, home owner's statements with regard to this Injured Worker performing work at their home, a transcript from a Common Pleas Court proceeding with the Injured Worker making admissions of his employment, the use of both the Injured Worker's Wife's Social Security number as well as his Father's Social Security number in the cashing of checks, many cash deposits into the account of the Injured Worker over these years as well as various court proceedings where the Injured Worker sued homeowners for not paying him as agreed for the construction work that he performed during the periods he was receiving temporary total disability compensation.

Further, this file contains numerous notices by the Bureau of Workers' Compensation on their forms, checks, entitlement letters as well as other documents provided to the Injured Worker for the periods from 2002 through 2014 where the Injured Worker was advised that it was necessary for him to notify the Bureau of Workers' Compensation if he performed any type of work during the periods he was receiving temporary total disability compensation. Further, the Injured Worker attended several Industrial Commission hearings with regard to the potential termination of his temporary total disability benefits. The Injured Worker was present at these hearings and the issue of whether the Injured Worker was working was germane to the issue heard

by the Industrial Commission Hearing Officer's [sic] in those hearings. The original Industrial Commission hearing which granted temporary total disability compensation for the period 01/23/2003 through 09/11/2003 and continuing was made by Hearing Officer Carol Pappas. Further this file contains evidence that the Injured Worker was a subcontractor/independent contractor for several businesses including S & J Construction as well as Miller Construction. The evidence on file indicates that in the year 2012 the Injured Worker received a 1099 from Miller Construction for approximately $19,000.00. The following year in 2013 the Injured Worker received a 1099 from Miller Construction for approximately $7,500.00 and he used his Wife's Social Security number for this contractor.

Provided were video surveillance clips in 2013 which showed the Injured Worker performing siding jobs for a contractor and he was personally performing the work. When he received payment for one of the surveillance jobs and received a check he used his Father's Social Security number to obtain the funds.

It is ordered by this Hearing Officer that this Injured Worker engaged in fraud for the entire period from 11/20/2002 through the date of today's hearing. All temporary total disability compensation paid during this period is declared an overpayment [and] shall be recouped pursuant to the fraud provisions of Revised Code Section 4123.511(K).

This order is based on the approximately 3000 pages of investigatory work done by the SIU unit of the Bureau of Workers' Compensation which clearly demonstrates that the Injured Worker made false representations to the Bureau of Workers' Compensation, knowing that the statements that he was not working were false, with the intent of deceiving the Bureau of Workers' Compensation who justifiably relied on those statements and to their detriment paid him temporary total disability compensation.

{¶ 28} 17. Van Buskirk administratively appealed the DHO's order of May 8, 2014.

{¶ 29} 18. Following a June 18, 2014 hearing, an SHO issued an order dismissing Van Buskirk's administrative appeal pursuant to an oral request from Van Buskirk's counsel.

{¶ 30} 19. On July 23, 2015, invoking R.C. 4123.52, the commission's continuing jurisdiction, relator moved that the commission disallow the entire industrial claim based on the DHO's order of May 8, 2014 that determined an overpayment of TTD compensation, and that the compensation was fraudulently obtained. In support, relator submitted the affidavit of Michael Coates, Jr., executed July 22, 2015.

{¶ 31} 20. The Coates affidavit avers:

> [One] I am Executive Vice President of Mike Coates Construction, Inc., * * *.
>
> * * *
>
> [Three] Van Buskirk alleged that he pulled his lower back on or about 11:00 AM on September 3, 2002 according to the "Accident Investigation Report" attached hereto and incorporated herein which was signed by Coates Superintendent Chuck Ivan ("Ivan") on September 4, 2002. Coates' Policies required immediate reporting of an incident but it was not reported to Ivan until the next day after Van Buskirk had completed a full day's work on September 3, 2002. When Ivan investigated he was unable to find any witness to substantiate Van Buskirk's alleged incident.
>
> [Four] During this time period my mother, Joanne Coates ("Joanne"), handled workers' compensation paperwork. Apparently a First Report of Injury was completed by Edmund Csernyik, D.O., based upon an office visit by Van Buskirk dated September 4, 2002 * * *.
>
> [Five] After September 3, 2002 Van Buskirk had no contact with Coates. According to the handwritten note presumably completed on or about September 25, 2002 attached hereto and incorporated herein Van Buskirk reported for work on September 25, 2002 to learn from Ivan that there were no longer any carpenter jobs on the project.
>
> [Six] On or about September 27, 2002 Joanne checked "Certification" but did not sign the "Dear Employer" Form Dated September 16, 2002. Joanne is the kind of person who would believe an allegation of a work-related injury. At this time the consequences of mistakenly certifying this Claim appeared to be relatively minimal since Van Buskirk had been cleared to return to work on September 25, 2002 for "Sprain Lumbosacral."

[Seven] On or about December 11, 2002 Van Buskirk himself, and then on or about December 31, 2002 through an attorney, filed a Motion with the Bureau of Workers' Compensation seeking additional allowances and compensation in Claim 02-425333. This began the events which, by the time I became responsible for Coates' workers' compensation in the 2007-2008 period, had transformed Claim 02-425333 into one which was virtually unmanageable.

[Eight] I am aware of the February 21, 2014 "Bureau of Workers' Compensation Special Investigations Unit C86 Motion" * * *. This Motion contains * * * records of office visits dating back to November 5, 2002 at which Van Buskirk reported various alleged physical complaints which served as a basis for different treating physicians to keep him off work.

* * *

[Ten] Attached hereto and incorporated herein is the June 10, 2015 office note of Chimezie C. Amanambu, M.D. which demonstrates that Van Buskirk is still receiving treatment and prescriptions paid under Claim 02-425333.

[Eleven] I ask all of the above be taken into consideration in this Request for .52 Relief and Claim 02-425333 be set for Hearing on the issue of Allowance.

{¶ 32} 21. Following a September 15, 2015 hearing, a DHO issued an order denying relator's July 23, 2015 motion.

{¶ 33} 22. Relator administratively appealed the September 15, 2015 order of the DHO.

{¶ 34} 23. On November 2, 2015, an SHO heard relator's administrative appeal from the DHO's order of September 15, 2015. The hearing was recorded and transcribed for the record.

{¶ 35} 24. Prior to the hearing, relator submitted three affidavits from employees or former employees of relator.

{¶ 36} 25. The affidavit of Anthony Bish executed October 31, 2015 avers:

[One] I currently am employed by Mike Coates Construction, Inc., * * * ("Coates") as a carpenter. I have worked continuously/intermittently for Coates since 95.

[Two] I became acquainted with James E. Van Buskirk, Jr. ("Van Buskirk") as a co-worker on the Akron Public Library project in the [sic] 2002.

[Three] In particular, I worked with Van Buskirk in September, 2002 on the Akron Public Library construction project. On September 3, 2002, which I have been informed was the Date of Injury in Workers' Compensation Claim 02-425333, I was working with Van Buskirk and several other co-workers. We were working on the same work crew, and in close proximity to each other.

[Four] I did <u>not</u> observe Van Buskirk get hurt at work. Van Buskirk did not say anything to me about getting hurt at work.

[Five] I personally did not notice any kind of physical impairment in Van Buskirk's performance of his job duties. He appeared to be working normally and finished his full day of work.

[Six] The next day, September 4, 2002, Van Buskirk did not come to work. Within a couple of days co-workers and I heard that Van Buskirk was claiming that he had gotten hurt at work on September 3, 2002. Because of what I had personally witnessed, I doubted that the injury had taken place.

(Emphasis sic.)

{¶ 37} 26. The affidavit of Adam Bundy executed October 30, 2015 avers:

[One] I currently am employed by Mike Coates Construction, Inc. * * * ("Coates") as a carpenter. I have worked continuously/intermittently for Coates since 1993.

[Two] I became acquainted with James E. Van Buskirk, Jr. ("Van Buskirk") as a co-worker on the Akron Public Library project in the [sic] 2002.

[Three] In particular, I worked with Van Buskirk in September, 2002 on the Akron Public Library construction project. On September 3, 2002, which I have been informed was the Date of Injury in Workers' Compensation Claim 02-425333, I was working with Van Buskirk and several other co-workers. We were working on the same work crew, and in close proximity to each other.

[Four] I did <u>not</u> observe Van Buskirk get hurt at work. Van Buskirk did not say anything to me about getting hurt at work.

[Five] I personally did not notice any kind of physical impairment in Van Buskirk's performance of his job duties. He appeared to be working normally and finished his full day of work.

[Six] The next day, September 4, 2002, Van Buskirk did not come to work. Within a couple of days co-workers and I heard that Van Buskirk was claiming that he had gotten hurt at work on September 3, 2002. Because of what I had personally witnessed, I doubted that the injury had taken place.

(Emphasis sic.)

{¶ 38} 27.  The affidavit of Mike Lahey, Jr. executed November 1, 2015 avers:

[One] I am currently retired from Mike Coates Construction, Inc. * * *. I worked for Coates since 1987 as a carpenter, carpenter foreman, assistant superintendent and then superintendent.

[Two] I became acquainted with James E. Van Buskirk, Jr. ("Van Buskirk") on the Akron Public Library project in the 2002.

[Three] In particular, I was an assistant superintendent and was responsible for directly supervising the crew on which Van Buskirk worked in September, 2002 on the Akron Public Library construction project. On September 3, 2002, which I have been informed was the Date of Injury in Workers' Compensation Claim 02-425333, I supervised Van Buskirk and several other workers.

[Four] I did <u>not</u> observe Van Buskirk get hurt at work; and Van Buskirk did not report any injury to me.

[Five] I personally did not notice any kind of physical impairment in Van Buskirk's performance of his job duties. He appeared to be working normally and finished his full day of work.

[Six] The next day, September 4, 2002, Van Buskirk did not come to work. Within a couple of days co-workers and I heard that Van Buskirk was claiming that he had gotten hurt at work on September 3, 2002. Because of what I had personally witnessed, I always suspected his claim of injury to be false.

(Emphasis sic.)

{¶ 39} 28. Following the November 2, 2015 hearing, the SHO mailed an order on November 6, 2015 that affirms the DHO's order of September 15, 2015 and denies relator's July 23, 2015 motion. The SHO's November 2, 2015 order explains:

It is the order of the Staff Hearing Officer that the C-84 Motion filed by the Employer on 07/23/2015 is denied.
It is the order of the Staff Hearing Officer that the Employer's request that the Industrial Commission exercise continuing jurisdiction and disallow this claim in its entirety is denied.

By way of clarification, the Staff Hearing Officer notes that in an order issued by a District Hearing Officer on 05/13/2015 the Injured Worker was found to have perpetrated a fraud in this claim with respect to the receipt of temporary total disability compensation and benefits from 11/20/2002 through 05/08/2014 inclusive. As a result, an overpayment of temporary total disability compensation over this period was found. In addition, the Staff Hearing Officer notes that the Injured Worker was convicted in Federal Court for, among other things, Workers' Compensation fraud. Based on the Injured Worker's misdeeds the Employer is now questioning the original allowance of this claim.

On 09/11/2002 [sic], the Injured Worker filed an FROI-1 First Report of an Injury, Occupational Disease or Death application alleging a low back injury that occurred at work on 09/03/2002. In support of allowance of this claim the Injured Worker presented himself to Falls Family Practice on 09/04/2002. The treatment record from this visit notes the mechanism of injury, diagnoses the allowed lumbosacral sprain and indicates that medications were being prescribed along with a request for the Injured Worker to follow-up. The Staff Hearing Officer notes that while this office visit reflected subjective complaints the provider also found objective evidence of spasms. On 09/27/2002 the Employer sent a certification of the claim which was completed by

Joanne Coates, Secretary. Mr. Coates indicated by testimony and in his Affidavit that Ms. Coates was his Mother and was the person who handled the Workers' Compensation matters for the Employer at the time of the Injured Worker's injury. Therefore, the certification of this claim was made by an individual who appeared to have authority to do so. Mr. Coates did not begin handling the Employer's Workers' Compensation matters until sometime in 2007. As a result of the medical evidence on file and the Employer's certification, the Bureau of Workers' Compensation issued an order on 09/25/2002 that allowed this claim for lumbosacral sprain. This decision was not appealed by the Employer.

The Employer now alleges that because the Injured Worker was dishonest about whether he was working and receiving temporary total disability compensation benefits that he must also be dishonest regarding the injury and allowance of the claim. However, no proof has been submitted which would establish that the mechanism of injury and resulting medical information relied upon in allowing this claim was fraudulent. As noted above, the initial treatment record contained objective evidence of spasms in the low back. The Employer is also noting concern that the injury happened on the morning of 09/03/2002 and that the Injured Worker continued to work that day, not immediately reporting it to the Employer. This fact alone does not establish that the injury was staged or fraudulent. The Injured Worker did miss work on 09/04/2002, the day following the date of injury, and sought medical treatment at that time. A majority of the Employer's arguments actually concerned the deceit that the Injured Worker used in order to obtain temporary total compensation benefits to which he was not entitled and allegations that the Injured Worker was selling the prescription medications he obtained in this claim. Although the Injured Worker perpetrated a fraud in order to obtain temporary total disability compensation benefits to which he was not entitled, it does not necessarily mean that the 09/03/2002 injury did not occur. Other than Affidavits from three individuals employed [by] the Employer of Record's company that were completed on 11/01/2015 [sic], no other evidence has been provided to establish that an injury did not occur on 09/03/2002. A review of these Affidavits reveal that they are all remarkably similar, having been prepared by the same person, and all that was necessary was for individuals to sign the documents. Moreover, given the length and time between the original injury and completion of the Affidavits the Staff Hearing Officer questions the

authors' recollection of events on or about 09/03/2002. Lastly, these Affidavits offer nothing more to the record that has not already been presented.

Had the Employer had concerns about the allowance of this claim, as indicated by Mr. Coates in his Affidavit and testimony, the same could have been pursued early in this claim's life. Prior to the finding of fraud on 05/28/2014 eight hearings were held in front of Hearing Officers of the Industrial Commission from 01/23/2003 through 09/11/2013, inclusive. The first three hearings were attended by the Employer's Third Party Administrator. In addition, four orders were issued by the Bureau of Workers' Compensation between 09/25/2002 and 02/15/2008 that allowed this claim, set the Injured Worker's wages and granted additional allowances. The Employer never challenged these decisions. Accordingly, based on a totality of the evidence the Staff Hearing Officer finds that the Employer has not substantiated that the allowance of this claim was predicated upon the Injured Worker's fraud and, therefore, the Employer's request to have this claim disallowed the claim [sic] is denied.

{¶ 40} 29. On November 20, 2015, relator appealed the SHO's order of November 2, 2015 to the three-member commission.

{¶ 41} 30. On December 12, 2015, the three-member commission mailed an order refusing to hear relator's appeal from the SHO's order of November 2, 2015 (mailed November 6, 2015).

{¶ 42} 31. On February 17, 2016, relator, Mike Coates Construction, Inc., filed this mandamus action.

Conclusions of Law:

{¶ 43} The issue before the SHO at the November 2, 2015 hearing was whether the commission should invoke continuing jurisdiction over the September 25, 2002 bureau order that allowed the industrial claim. The commission, through its SHO, determined that the exercise of continuing jurisdiction is inappropriate based on the evidence of record.

{¶ 44} Here, the issue is whether the commission, through its SHO, abused its discretion in determining that the exercise of continuing jurisdiction over the September 25, 2002 bureau order was inappropriate. Finding no abuse of discretion, it is

the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

## Basic Law

{¶ 45} The commission's continuing jurisdiction under R.C. 4123.52 is not unlimited. Continuing jurisdiction can be invoked only where one of these prerequisites exists: (1) new and changed circumstances, (2) fraud, (3) clear mistake of fact, (4) clear mistake of law, or (5) error by an inferior tribunal. *State ex rel. Gobich v. Indus. Comm.*, 103 Ohio St.3d 585, 2004-Ohio-5990, ¶ 14. *State ex rel. Nicholls v. Indus. Comm.*, 81 Ohio St.3d 454, 458 (1998).

## Which Prerequisite?

{¶ 46} Relator's request for the exercise of continuing jurisdiction was premised on fraud. This was made abundantly clear by relator's counsel at the November 2, 2015 hearing before the SHO:

> And I would initially note that one of the reasons we have continuing jurisdiction is because facts may become known after that initial moment of certifying a claim.
>
> Secondly, and this is what we're really trying to address today, which is, [the district hearing officer] noticed that there was no proof submitted that would establish that the mechanism of injury and resulting medical information relied upon in allowing the claim was fraudulent. Although, the injured worker perpetrated a fraud, it does not necessarily follow that the original injury did not occur.
>
> And one of the things, as I say, we are focused on today, is that kind of proof that the incident itself was fraudulent.

(Tr. at 5.)

{¶ 47} Moreover, relator makes clear in this action that fraud is the prerequisite that relator relies on. (Relator's brief, 8.) (Relator's reply brief, 1.)

## Analysis

{¶ 48} The February 21, 2014 SID report and the May 8, 2014 DHO's order that determined that TTD compensation was fraudulently obtained based on that SID report are at the core of relator's argument for the exercise of continuing jurisdiction based on fraud. Relator's argument suggests that it must be inferred from the SID report and the

DHO's order that the September 25, 2002 claim allowance was also fraudulently obtained.   Neither the commission nor this court are required to accept relator's inference.

{¶ 49} The commission members and their hearing officers, like any fact-finder in any administrative, civil, or criminal proceeding, may draw reasonable inferences, and rely on their own common sense in evaluating the evidence.   *State ex rel. Supreme Bumpers, Inc. v. Indus. Comm.*, 98 Ohio St.3d 134, 2002-Ohio-7089, ¶ 69.

{¶ 50} The SHO's order of September 15, 2015 strikes directly at the very core of relator's argument:

> Although the Injured Worker perpetrated a fraud in order to obtain temporary total disability compensation benefits to which he was not entitled, it does not necessarily mean that the 09/03/2002 injury did not occur.

{¶ 51} In concluding that the perpetration of a fraud in obtaining TTD compensation does not necessarily mean that the September 3, 2002 injury did not occur, the SHO simply relied on his own common sense in evaluating the evidence.  This exercise of continuing jurisdiction was well within the fact-finding discretion of the SHO who conducted the November 2, 2015 hearing.  Relator's inference was appropriately rejected by the SHO.

{¶ 52} Moreover, while the affidavits of Anthony Bish, Adam Bundy, and Mike Lahey, Jr., aver that no injury was observed at the worksite on September 3, 2002, the SHO appropriately explained why the affidavits failed to provide credible evidence that the injury did not occur. As noted by the SHO, the affidavits are remarkably similar, having been prepared by the same person.  Also, given the length and time between the injury and the execution of the affidavits, the SHO questioned the authors' recollection of events.  It was clearly within the fact-finding discretion of the SHO to reject the affidavits.

{¶ 53} Given the above analysis, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

**Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).**